UNITED STATES of America, Appellee,

v.

John M. RICHARDSON, Appellant.

No. 97-3152.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 28, 1998.

Decided Oct. 27, 1998.

Douglas Wham, appointed by the Court, argued the cause and filed the briefs for appellant.

Michael Fitzpatrick, Assistant United States Attorney, argued the cause for appel-

lee. With him on the brief were Wilma A. Lewis, United States Attorney, John R. Fisher, Elizabeth Trosman, Diana Harris Epps and Brenda B. White, Assistant United States Attorneys.

Before: EDWARDS, Chief Judge, WALD and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

A jury convicted John M. Richardson of the unlawful possession of a firearm by a convicted felon, the unlawful possession of ammunition by a convicted felon, and of threatening to injure another person. On appeal, appellant challenges his convictions and sentence on a number of grounds, including (1) insufficient evidence for the jury to convict him of constructive possession of a loaded firearm; (2) improper joinder of the local District of Columbia threats charge with the federal firearm and ammunition counts; (3) an improper appeal to the racial sensitivities of the jury in the government's closing argument; and (4) error by the district court in designating a prior conviction of appellant as a crime of violence for purposes of determining the guidelines base offense level.[1]

Although this is a close case, we find that there was sufficient evidence for the jury to convict appellant of constructive possession of a loaded firearm. However, we agree with appellant that the district court erred in failing to dismiss the local threats charge for lack of jurisdiction and that certain remarks made by the prosecutor constituted improper appeals to the racial sensitivities of the jury. Given the closeness of the case, we find these errors to be substantial and prejudicial, necessitating the reversal of appellant's convictions on both the weapons and the threats counts.[2] Finally, although our reversal of the convictions renders the sentencing issue moot, we think it prudent to register our observation that designating a prior conviction of appellant as a crime of violence for purposes of determining the guidelines base offense level was mistaken because the court did not have before it the necessary information to determine whether that conviction constituted a crime of violence as defined by the guidelines.

## I. Background

On January 16, 1997, the government charged appellant in a three-count indictment with (1) unlawful possession of a firearm by a convicted felon, (2) unlawful possession of ammunition by a convicted felon, both in violation of 18 U.S.C. § 922(g)(1), and (3) threats to injure another person, in violation of D.C.Code § 22–2307. All three offenses allegedly occurred on the night of December 18, 1996. The firearm and ammunition possession counts both arose from appellant's alleged possession of a loaded gun, specifically described in the indictment as a Glock 9mm semi-automatic pistol. The threats charge, a District of Columbia offense for which the maximum punishment is twenty years, was based on remarks appellant made to a police officer after he had been arrested for possession of a loaded gun and transported to the police station.[3] Appellant filed several pretrial motions, including a motion for dismissal of the local threats charge, arguing that the district court lacked jurisdiction over the charge because it had been improperly joined with the weapons counts under Federal Rule of Criminal Procedure 8(a). The district court heard oral argument on the joinder issue on two different occasions but ultimately rejected appellant's motion.

1. Appellant also argued that the firearm and ammunition counts were multiplicitous and hence that one of the two must be vacated on double jeopardy grounds. The government concedes on appeal that appellant's two convictions should be merged and one vacated.

2. We dismiss the threats count on jurisdictional grounds.

3. D.C.Code § 22–2307 provides that "[w]hoever threatens within the District of Columbia to kidnap any person or to injure the person of another or physically damage the property of any person or of another person, in whole or in part, shall be fined not more than $5,000 or imprisoned not more than 20 years, or both."

A jury trial began on April 8, 1997. At the end of the government's case, appellant moved for a judgment of acquittal as to all three counts. The district court denied this motion. After the defense presented its evidence, appellant renewed his motion for a judgment of acquittal. The court took this motion under advisement. Later that same day, the jury returned verdicts of guilty as to all three counts. With respect to the firearm and ammunition counts, the jury found appellant guilty on a theory of constructive possession rather than actual possession. Appellant filed a written post-trial motion for judgment of acquittal, which the district court also denied.

A sentencing hearing was held on November 17, 1997. The Presentence Investigation Report ("PSR") calculated appellant's offense level at 20 based on a determination that appellant had been convicted of a prior crime of violence, a 1982 Virginia conviction for statutory burglary.[4] The sentencing guidelines define a "crime of violence" as, *inter alia,* the "burglary of a dwelling." U.S.S.G. § 4B1.2(a)(2). However, the Virginia statute to which appellant apparently pled guilty covers burglaries of non-dwelling structures as well. Appellant thus argued at sentencing that the court could not increase his offense level for having been convicted of a prior crime of violence without having before it a charging document, plea agreement or the like which would reliably indicate that appellant had in fact pled guilty to the burglary of a dwelling and not of some other structure. The government argued that the court could rely on a description of the crime listed in the PSR provided by the United States Probation Office for the Western District of Virginia which indicated that the burglary was of a dwelling, noting the names of its owners and what was stolen from it. After hearing substantial argument on the issue, the district court ruled that the 1982 Virginia conviction did qualify as a "crime of violence" both because it was a burglary of a dwelling and because it involved conduct that presented a serious potential risk of physical injury to another.[5]

The district court accordingly determined that appellant was properly assigned an offense level of 20 which, coupled with a criminal history category of V, produced a sentencing range for the gun and ammunition counts of 63–78 months. The court sentenced appellant to a term of 78 months of imprisonment for each of these counts, to run concurrently, and imposed a consecutive sentence of 4–12 years for count three, the D.C. threats charge.

## II. Discussion

### A. *Sufficiency of Evidence*

Appellant first argues that the evidence was insufficient to support his convictions on the weapons counts. In assessing this claim, we must view the evidence in the light most favorable to the government, drawing all reasonable inferences in the government's favor. *See, e.g., United States v. Dingle,* 114 F.3d 307, 310 (D.C.Cir.1997). Moreover, our inquiry is "limited to the question of whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Appellant was convicted of constructive possession of a loaded firearm. Constructive possession requires "evidence supporting the conclusion that the defendant had the ability to exercise knowing 'dominion and control' over the items in question." *United States v. Morris,* 977 F.2d 617, 619 (D.C.Cir.1992) (quoting *United States v. Hernandez,* 780 F.2d 113, 116 (D.C.Cir. 1986)). Generally, neither "mere proximity" to nor "mere knowledge of the presence" of

4. U.S.S.G. § 2K2.1(a)(4)(A) provides that in cases involving the unlawful possession of firearms or ammunition, the base offense level to be applied is 20 if the defendant had a prior felony conviction of a crime of violence.

5. U.S.S.G. § 4B1.2(a)(2) defines a crime of violence as,

> any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that—
>
> . . .
>
> (2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

contraband alone is enough to prove constructive possession, *see Morris,* 977 F.2d at 619–20; *Hernandez,* 780 F.2d at 116; however, "proximity coupled with 'evidence of some other factor—including connection with a gun, proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement in an enterprise' is enough to sustain a guilty verdict." *Morris,* 977 F.2d at 620 (quoting *United States v. Gibbs,* 904 F.2d 52, 56 (D.C.Cir.1990)).

■ The government's evidence against appellant on constructive possession of a loaded gun consisted primarily of the testimony of Lamar Hazelton. Hazelton testified that on December 18, 1996, at 10:00 p.m., he was standing with some friends in front of a carry-out in D.C. when he was approached by a man who asked in a threatening tone if Hazelton had seen "Roger," a friend of Hazelton. Hazelton replied that he had not. The man then circled Hazelton and his friends several times before walking away. About five to ten minutes later, the man again approached Hazelton and demanded to know Roger's whereabouts. When Hazelton replied that he had no idea where Roger was, the man became agitated and told Hazelton to tell Roger that he was going to "burn" him. The man then opened his coat to show Hazelton the handle of a gun protruding from an inside pocket. After this second encounter, Hazelton left the area. As he was leaving, Hazelton observed the man approach the driver's side of a car, lean into the front driver's side window, and appear to talk to the driver.

Hazelton returned to the same area about five minutes later where he encountered Metropolitan Police Officer Eldrick Creamer, who was patrolling the area. Hazelton told Creamer about his two encounters with the man and provided Creamer with a description of the suspect—black man, wearing black clothes, with a bald head.[6] Upon receiving this information, Creamer moved through an alley to another street, where he observed a man talking on a cellular phone who fit the description given to him by Hazelton. That man was appellant. Creamer detained appellant with the help of fellow officer, Paul Regan. During appellant's detention, Hazelton, who had followed Creamer onto the second street, walked past appellant and gave Creamer an affirmative nod to indicate that he had the right man. Appellant was searched but no gun was found on him.

When Creamer apprehended him, appellant was standing about 10–15 feet away from a car which Hazelton identified as the one he had seen the suspect leaning into earlier that night. This car was occupied by three men, one in the driver's seat and two in back; the front passenger seat was empty. All three men were black, all three were wearing black clothes, and all three were roughly the same height, weight and complexion as appellant.[7] A search of the vehicle and its occupants uncovered two guns, one on the person of the driver and the other—a loaded black 9mm Glock semiautomatic pistol—on the floor under the front passenger seat. Appellant and the car's occupants were all arrested and taken to the police station.

At trial, Hazelton identified appellant in court as the man who had twice asked him about Roger and who had shown him the handle of a gun protruding from his coat pocket. No usable prints were lifted from the Glock, but Hazelton testified that its handle was similar in appearance to the handle of the gun he had seen on the man looking for Roger. Hazelton admitted, however, that he could not state with absolute certainty that it was the same pistol he had

6. There was some confusing testimony at trial about whether the description given by Hazelton indicated that the suspect was wearing a hat. Creamer testified at trial that Hazelton had stated that the suspect had some sort of headpiece on. When subsequently questioned as to this at trial, however, Hazelton indicated that he could not have said the suspect had a hat on because he had noted that the suspect was bald. *See* 4/10/97 Transcript ("Tr.") at 449.

7. Officer Creamer testified that all three of the men in the car were dressed in black. *See* 4/9/07 Tr. at 292. Officer Eric Skinner of the Identification and Records Division of the Metropolitan Police Department testified about the physical characteristics of the three men and appellant. All four men were designated as being medium complected and their heights and weights were 5'6", 120; 5'10", 205; 5'10", 200; 5'11", 205 (appellant). *See* 4/10/97 Tr. at 536–37.

seen the evening of the incident.[8] Hazelton also identified at trial a picture of the car from which the Glock was recovered as the same kind of car he had seen the suspect leaning over that night, but admitted that he was not sure if it was in fact the same car.[9]

Viewing Hazelton's testimony in the light most favorable to the government and giving the government the benefit of all reasonable inferences therefrom, we conclude that a reasonable trier of fact could find the requisite connection between appellant and the gun required for a conviction based on constructive possession. Hazelton's testimony offered evidence that appellant had at one time possessed a gun like the Glock, that he had a motive to possess a gun (*i.e.*, to "burn" Roger), and that he had been observed leaning over the car in which the Glock was found. The jury was free to credit this testimony and could reasonably infer from it that appellant had constructively possessed a gun.

Again, we emphasize that this was not a strong case of constructive possession; however, our role in assessing the sufficiency of the evidence "is sharply circumscribed." *United States v. Poston,* 902 F.2d 90, 94 (D.C.Cir.1990). "We are not a second jury weighing the evidence anew and deciding whether or not we would vote to convict the defendant." *Id.* Accordingly, we find that the evidence was legally sufficient to establish that appellant constructively possessed the firearm in question.

B. *Joinder of Local Threats Charge with Federal Weapons Charges*

Appellant argues that the joinder of the threats charge with the firearm and ammunition counts was improper under Fed. R.Crim.P. 8(a), and, accordingly, that the district court lacked jurisdiction over the threats charge.[10]

The district court possesses jurisdiction over a D.C.Code offense "only if the 'offense is joined in the same information or indictment with [a] Federal offense.'" *United States v. Koritko,* 870 F.2d 738, 739 (D.C.Cir.1989) (quoting 11 D.C.Code Ann. § 502(3) (1981)). Joined means "properly joined in accordance with Rule 8(a), Fed. R.Crim.P." *Id. See also United States v. Jackson,* 562 F.2d 789, 793 (D.C.Cir.1977). To be properly joined under Rule 8(a), offenses must be "of the same or similar character or based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan."

Admittedly, Rule 8 has generally been construed liberally in favor of joinder. *See United States v. Gibbs,* 904 F.2d 52, 56 (D.C.Cir.1990) ("[J]oint trials may be preferred, given the heavy and increasing criminal case load in our trial courts."). However, joinder under Rule 8 is not infinitely malleable: it cannot be stretched to cover offenses, like those here, which are discrete and dissimilar and which do not constitute parts of a common scheme or plan. Moreover, joinder in this case has jurisdictional implications: in contrast to joinder cases involving two or more federal offenses, where a court need only determine whether to conduct one or several trials, in this case the court lacked jurisdiction altogether over the threats charge if it was not properly joined with the federal offenses. *See Jackson,* 562 F.2d at 797. And, as the *Jackson* court noted, because Congress has determined that D.C. crimes should generally be tried in the D.C. courts,[11] "the joinder provisions of Rule 8

8. In fact, on redirect, Hazelton's identification of the gun he had seen on the suspect faltered somewhat: "It's black. The handle, the handle. (Pause). The handle.... I can't remember exactly how it looked." 4/10/97 Tr. at 419–20.

9. Hazelton recalled that the car was gray but admitted that he might have been mistaken about the color (the car was in fact blue).

10. The threats charge arose from comments appellant made to Officer Creamer after having been arrested on the weapons charge. Creamer testified that appellant was on the phone when he began to speak very loudly, using profanity and making derogatory comments to Creamer. When Creamer informed appellant that his phone time was up, appellant replied: "Bitch-ass nigger, I'm going to get you when I get out." 4/9/97 Tr. at 271.

11. The *Jackson* court noted that a major purpose of the District of Columbia Court Reform and Criminal Procedure Act of 1970 was "to shift general jurisdiction over D.C.Code offenses from the United States District Court to the Superior

should not be strained to uphold federal jurisdiction over local crimes." *Id.*

We believe that Rule 8 was strained beyond tolerable limits to provide jurisdiction over the local threats charge. In order for offenses discrete and dissimilar on their faces to be properly joined under Rule 8, there must be some logical relationship between them. *See United States v. Perry,* 731 F.2d 985, 990 (D.C.Cir.1984). The government argues that these offenses are logically connected in a "but for" sequential relationship: but for the arrest of appellant on the weapons charges, he would not have been motivated to threaten Officer Creamer. We disagree. Offenses do not become logically related solely by way of an intervening arrest; that is, the fact that an intervening arrest brings preceding and succeeding offenses together temporally or precipitatively simply does not suffice to create the logical relationship contemplated by Rule 8 which requires that they be "connected together or constitut[e] parts of a common scheme or plan."

Also militating against joinder in this case is the fact that there was no overlap of issues or evidence between the weapons and threats offenses, thus one of the primary purposes behind Rule 8 joinder, judicial economy, never came into play: "In determining whether offenses are based on 'acts or transactions connected together,' the predominant consideration is whether joinder would serve the goals of trial economy and convenience; the primary purpose of this kind of joinder is to insure that a given transaction need only be proved once." *Baker v. United States,* 401 F.2d 958, 971 (D.C.Cir.1968). Where there is substantial overlap in evidence between two offenses, joinder "eliminate[s] the need to prove substantially the same evidence twice over, thus realizing precisely the kind of economy envisaged by Rule 8(a)." *Blunt v. United States,* 404 F.2d 1283, 1288 (D.C.Cir.1968). Where there is no substantial overlap in evidence and particularly where the evidence necessary to prove each of the offenses would be inadmissible in a trial of the other, judicial economy does not favor joinder. *Cf. United States v. Leonard,* 445 F.2d 234, 236 (D.C.Cir.1971) ("The critical element of the case ... is the simple fact that [evidence surrounding the joined offense] would have been admissible in evidence in a [separate] trial.... In this situation the joinder of offenses promotes the kind of efficiency of administration of criminal justice that is the objective of Rule 8."). In the instant case, there was no evidence necessary to prove the threats offense which was also necessary—or even admissible, *see* discussion below—to prove the weapons offenses. Judicial economy did not favor joinder in this case.

In sum, we find that the D.C.Code threats charge was not properly joined with the federal weapons charges under Rule 8(a) and that the district court therefore erred in failing to dismiss it as requested by appellant in pretrial motion. Accordingly, we reverse the threats conviction and dismiss the charge for lack of jurisdiction.

### C. *Effect of Misjoinder on Weapons Charges*

We dismiss the threats charge for lack of jurisdiction; however, we must also determine the extent to which appellant was prejudiced with respect to his weapons convictions as a consequence of the misjoinder. The Supreme Court has held that an error involving misjoinder requires reversal if "the misjoinder results in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.'" *United States v. Lane,* 474 U.S. 438, 449, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). In *Lane,* the Supreme Court determined that the misjoinder was harmless because, among other things, the evidence of the defendants' guilt there was otherwise "overwhelming" and, further, because the evidence surrounding the misjoined count would likely have been admissible on retrial of the other properly joined counts. *Lane,* 474 U.S. at 450, 106 S.Ct. 725.

In contrast, the evidence against this appellant on the weapons charges was, as al-

Court of the District of Columbia." 562 F.2d at 793.

ready noted, relatively thin. Moreover, evidence of the post-arrest threats charges would almost certainly not have been admissible had the weapons charges been tried separately.[12] As a result of the misjoinder, the jury heard irrelevant and clearly prejudicial evidence in connection with the threats charge at the time it was determining appellant's guilt on the weapons charges. As a general matter, there was the obvious danger that a jury might have been influenced against appellant simply because he was the "type" of person who would threaten a police officer. But more specifically in this case, the jury had to determine whether to credit Hazelton's testimony that appellant was the same man who had threatened to "burn" Hazelton's friend Roger. Clearly, the jury would have been more likely to credit this testimony if it heard evidence that appellant had threatened someone else later that night.

We are not prepared to say that, in an otherwise uneventful trial, misjoinder standing alone would require reversal of appellant's weapons convictions. Again, however, given the meagerness of the evidence along with the clearly improper remarks made by the prosecutor in closing argument, *see* discussion below, we simply cannot say that the misjoinder here was harmless, that is, that it did not have a " 'substantial and injurious effect or influence in determining the jury's verdict.' " *Id.* at 449, 106 S.Ct. 725 (quoting *Kotteakos,* 328 U.S. at 776, 66 S.Ct. 1239).

D. *Prosecutor's Improper Remarks*

Appellant argues that the prosecutor's closing argument was improper and prejudicial because it interposed the issue of race into the case with the intent of disparaging defense counsel and of fostering an identification of the prosecutor with the jury at the expense of defense counsel. The comments of which appellant complains arose from the prosecutor's apparent effort to rebut appellant's misidentification defense. At trial, appellant constructed a defense of misidentification based on the fact that all three men apprehended in the car in which the Glock was found basically fit the general description given by Hazelton to Creamer and that, in fact, one of these men, Kelvin Spinner, was approximately the same height and weight as appellant, was bald, had some sort of hat with him when arrested, and was seated directly behind the passenger seat under which the Glock was found.

In an apparent attempt to rebut this misidentification defense, the prosecutor made the following argument in reference to photographs of appellant and the three other men arrested that night:

> Now you are going to have government's exhibits nos. 21–A, 21–B, 21–C, and 21–D. Now, if you think everybody looks alike, then maybe 21–A and –B, you can think that [Hazelton] made a mistake, ladies and gentlemen. But don't fall prey to, we all look alike, because [Hazelton] knew the difference.

4/11/97 Tr. at 629. On rebuttal, the prosecutor returned to this argument: "Again, we don't all look alike, ladies and gentlemen." 4/11/97 Tr. at 669.

Appellant argues that the obvious suggestion underlying the prosecutor's remarks was that defense counsel's misidentification theory was itself based on a racial stereotype of the "they all look alike" variety.[13] The government argues that the more natural interpretation of her remark is that people in general do not all look alike, a neutral and inoffensive observation. It is true, as this court has noted, that courts " 'should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning' " or that a jury " 'will draw that meaning from the plethora of less damaging interpretations.' " *United States v. Monaghan,* 741 F.2d 1434, 1441 (D.C.Cir.1984) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 646–47, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). However, the prosecutor did repeat

12. The evidence would not be relevant to a material issue other than character, *see* Fed.R.Evid. 404(b), and would, in any event, be prejudicial under Fed.R.Evid. 403.

13. Since the prosecutor, the defendant, Hazelton, and the other car occupants (but not defense counsel) were all African–American, appellant argues that the "they all look alike" stereotype converted into "we [don't] all look alike" in the prosecutor's closing argument.

her "we don't all look alike" argument and there can be no gainsaying that the remark is instantly recognizable as a reference to racial stereotyping. Regrettably, we find under the circumstances that the risk was altogether too real that a juror would take from this reference the distinct impression that the prosecutor herself believed defense counsel to be flirting with racial stereotyping in constructing his misidentification defense.[14]

Moreover, these references arose in the context of what must reasonably be read as a marked attempt by the prosecutor to portray defense counsel as an interloper in a world to which the other trial participants—the prosecutor, the defendant, Hazelton and the jurors—belonged. Defense counsel attempted in closing argument to challenge Hazelton's credibility by noting, among other things, that Hazelton was barely 17 at the time the incident occurred.[15] In her rebuttal argument, the prosecutor argued the following:

> In Mr. Boss's [defense counsel's] world, 17–year–old boys don't have to have those responsibilities. In Mr. Boss's world, people don't come of age if they can drink alcohol, people who don't come of age become responsible until they can vote. In the District of Columbia, people come of age when they have to come of age, ladies and gentlemen.
>
> * * *
>
> Mr. Boss's world is a wonderful world, but in Lamar Hazelton's world, he had to know whether a gun was cocked or not. He's had unfortunate incidents, and the one thing Mr. Boss's world doesn't obviously understand today is that when an unknown black male who's bald and comes up looking for one of your boys, Roger, and comes back and threatens with a gun and burning someone, that you're going to remember his face.
>
> * * *
>
> In Mr. Boss's world, a 17–year–old isn't supposed to be responsible for your friend. That's in Mr. Boss's world.
>
> * * *
>
> Now, the final thing in Mr. Boss's world, ladies and gentlemen, is that a 17–year–old man growing up in the red zone, who has decided to do the right thing by going to a military-type boot camp to ensure that he gets a high school diploma and to study for the S.A.T., you don't study for the S.A.T to go back on the corner, ladies and gentlemen. You study for the S.A.T to go to college, and if you don't think that someone with that mature caliber of an individual is able to come in here and to present testimony in a serious situation as today, then you, too, perhaps live in a Mr. Boss's world, because that gentleman is our future and he's doing the right thing.

4/11/97 Tr. at 665–68.

While a prosecutor "'may strike hard blows, [she] is not at liberty to strike foul ones.'" *United States v. Young,* 470 U.S. 1, 7, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (quoting *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)). Reluctantly, we conclude that the prosecutor's "we don't all look alike" remarks, surely susceptible of if not compelling the interpretation that defense counsel based his misidentification defense on a racial stereotype, as well as her suggestion that defense counsel was out of touch with the realities and concerns of Hazelton's world and, by implication, of the jury's as well, tack too close to the wind and, in a close case like this, could well

14. The possibility that the jury would have so understood the prosecutor's remarks is particularly troublesome here because misidentification was appellant's only defense. Insofar as the prosecutor raised the spectre that this defense was based on racist assumptions, appellant was clearly prejudiced.

15. Defense counsel's precise words were the following:

> So it comes down to Lamar Hazelton. Lamar Hazelton just turned 17 at the time this occurred. He's one month past 16. He's not old enough to vote. He's four years away from society deeming him responsible enough to be able to drink a beer. This is the man upon whom Mr. Richardson's fate relies, because he is the only man that identifies Mr. Richardson as the person who came up to him.

4/11/97 Tr. at 648.

have inflamed the emotions of the jury and resulted in a verdict based on something other than the evidence.[16]

Appellant concedes that he failed to object to these remarks and therefore that the "plain error" standard of review applies. *See United States v. Perholtz,* 842 F.2d 343, 361 (D.C.Cir.1988). In order to reverse a conviction under plain error review, we must find that "an improper prosecutorial remark ... cause[d] substantial prejudice to the defendant." *Monaghan,* 741 F.2d at 1443. One of the factors determining whether an improper remark made by the prosecutor substantially prejudiced a defendant's trial is "the certainty of conviction absent the improper remarks." *Id.* Again, as we have noted, the evidence against appellant on the weapons counts was not such that his conviction was by any means a certainty. We therefore conclude that the improper remarks, in particular when coupled with the prejudice flowing from the misjoinder, did cause substantial prejudice to appellant. We find that under these circumstances the remarks amount to plain error and, accordingly, mandate reversal of appellant's weapons convictions.

E. *Sentence Enhancement*

Although reversal of appellant's convictions means that we need not reach this issue, we think it useful for future reference to note that the district court did not have before it the necessary information to determine whether appellant's prior state conviction of burglary was properly designated as a crime of violence for purposes of calculating appellant's base offense level.

The sentencing guidelines applicable to a violation of 18 U.S.C. § 922(g)(1) provide for a base offense level of 20 where the offender has one prior felony conviction for a crime of violence. *See* U.S.S.G. § 2K2.1(a)(4)(A). The guidelines define a crime of violence as, *inter alia,* a "burglary of a dwelling." U.S.S.G. § 4B1.2(a)(2). Appellant's PSR indicated that appellant had been convicted of a prior crime of violence—namely a 1982 Virginia burglary conviction. However, the Virginia statute to which appellant apparently pled guilty covers burglaries of dwellings and non-dwelling structures alike.[17] Accordingly, appellant argued at sentencing that the court could not find that he had been convicted of a prior crime of violence with respect to this burglary because the government had failed to produce a charging document, plea agreement, or the like which would reliably indicate the precise crime to which appellant pled guilty. The government argued at sentencing that it did not need to produce any such document because there was a sufficient basis in the record before the court to conclude that appellant had in fact pled guilty to burglary of a dwelling—namely, a description of the burglary which was contained in the PSR prepared for the current charges. This description had been provided by the United States Probation Office for the Western District of Virginia and indicated that the burglary to which appellant pled guilty was of a residential dwelling.

The government was unable to identify the original source of this description, that is, where the Probation Office for the Western District of Virginia obtained the information it passed along to the Probation Office for

16. That the prosecutor attempted to foster an identification with the jury at the expense of defense counsel is also evidenced by a remark the prosecutor made in her opening statement: "I'm a prosecutor, and to say that I represent the United States, I'm here in the District of Columbia and what I do and who my client is are [sic] the individuals who live in the District of Columbia, along with yourselves. So, as Mr. Boss's client is Mr. Richardson, my clients are the 14 people, yourselves, as well as your other residents...." 4/9/97 Tr. at 231–32. The government concedes that the foregoing comment was ill-advised and was not condoned by the United States Attorney's Office.

17. On appeal, the government indicated that it was prepared on remand to proffer a certified copy of the signed judgment for appellant's 1982 conviction which it claims establishes that appellant actually pled guilty to burglary under a section of the Virginia Code which is limited on its face to the burglary of a dwelling (meaning that the PSR was incorrect with respect to the section of the Virginia Code to which appellant pled guilty). We discuss the sentence enhancement issue in terms of what the sentencing court had before it at the time, not in terms of what the government has proffered on appeal.

the District of Columbia. Accordingly, as appellant correctly points out, there was simply no way of knowing at sentencing whether this description was obtained from a legitimate and reliable source, such as a charging document, a plea agreement, or a previous presentence investigation report adopted by the state court in the burglary case, or whether this description came from an untested source, such as an arrest warrant, a police report, or a prosecutor's proffer.

"[I]t is the responsibility of the government to produce such documents as are necessary to establish that a prior offense can be properly designated a 'crime of violence.'" *United States v. Hill,* 131 F.3d 1056, 1065, n. 10 (D.C.Cir.1997). If the government fails to meet this responsibility, a sentencing court may not turn to potentially unreliable second-hand information in designating a prior offense as a crime of violence.

For the reasons stated herein, we reverse the federal weapons convictions and order dismissal of the threats count for improper joinder.

*So ordered.*