# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 19, 2007        Decided April 8, 2008

No. 06-3048

UNITED STATES OF AMERICA,
APPELLEE

v.

VINCENT E. REED,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 03cr00560-01)

*Adam H. Kurland*, appointed by the court, argued the cause for the appellant.

*Patricia A. Heffernan*, Assistant United States Attorney, argued the cause for the appellee. *Jeffrey A. Taylor*, United States Attorney, and *Roy W. McLeese III* and *Julieanne Himelstein*, Assistant United States Attorneys, were on brief.

Before: HENDERSON, TATEL and KAVANAUGH, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LeCRAFT HENDERSON, *Circuit Judge*:  Vincent E. Reed was tried by a jury and convicted of armed bank robbery, 18 U.S.C. § 2113(a), (d).  He was also convicted of two violations of the District of Columbia Criminal Code namely, armed carjacking, D.C. Code § 22-2803(a)(1), (b)(1), and destruction of property, D.C. Code § 22-303.  The district court sentenced Reed to 300 months' imprisonment on the armed bank robbery, 180 months on the armed carjacking and 102 months on the destruction of property count, all to be served concurrently.  Judgment 2.  Reed appeals on three grounds, contending that (1) the court erred by admitting his allegedly involuntary confession into evidence; (2) in her closing argument the prosecutor  improperly compared him to Jesse James and Billy the Kid and vouched for the credibility of a Government witness; and (3) the court mischaracterized his criminal history and failed to consider mitigating evidence during sentencing.  Appellant's Br. 6–8 We affirm both Reed's conviction and his sentence.

## I.

On December 1, 2003, at approximately 9:30 a.m., a "tall, dark-skinned" man wearing a "hooded jacket" and "skull cap" with "ski mask" holes cut into it entered the Bureau of Engraving and Printing Federal Credit Union (credit union) located in Leahy Hall on the campus of The Catholic University of America (CUA).  12/12/05 Tr. 29, 51–52, 103–06, 135–36.  He pointed a gun at the teller and demanded money.  *Id.* at 103–05, 135–36.  A second man then "rushed in the door" and, at the masked man's direction, closed the door and shut the blinds.  *Id.* at 110–11.  The second man was a "medium-brown skinned" man in his "late 30's or early 40's."  *Id.* at 113.  He did not wear a mask or carry a gun.  *Id.* at 112–13.[1]  The masked

---

[1]A bank customer, Sarah Johnson, observed the men in the hallway outside the credit union just before the robbery.  During a

man began collecting cash and money orders from behind the counter. *Id.* at 113–15. When he had finished, the two rushed from the credit union. *Id.* at 69, 116. The teller, Sallie Lombre, then activated an alarm. *Id.* at 116–17. Robert Miller, a customer who was waiting outside the credit union, saw them flee. *Id.* at 67–69. He described one as wearing a "ski mask." *Id.* at 70. Miller went to the CUA security office, located some 20 feet from the credit union, to report the robbery; the CUA dispatcher had already heard the alarm and radioed for help. *Id.* at 41–44, 48, 74–75. Lombre watched from a window as the armed man "ran" across the lawn behind Leahy Hall.[2] *Id.* at 121–23. He escaped with $25,683. *Id.* at 128–29.

Responding to the dispatcher's call, CUA Officer Marvin Dicks immediately drove his unmarked van towards Leahy Hall where he saw two men who fit the description of the suspects walking at a "very fast pace." *Id.* at 204, 207–09. There was no one else in the area. *Id.* at 209. He watched as one of the men removed the "hat or mask" from his head and dropped it near Hartke Theater. *Id.* at 210–11. At about the same time, CUA Officers James Lee and Maurice Cartledge arrived in a marked CUA patrol car. 12/13/05 Tr. 131–35. The two officers observed the two men walking at a "medium-to-fast pace" between Leahy Hall and Hartke Theater. *Id.* at 135–36. When the two men saw the CUA officers, one pulled the hood of his jacket over his head "like he didn't want to be seen" and continued on Harewood Road. *Id.* at 136–37, 140. The two

---

photo line-up Johnson identified the second man as Reed's brother, Ronald Reed. 12/12/05 Tr. 176, 178–81, 187–89; 12/14/05 Tr. 49–50.

[2]Michael Paolantonio, a CUA student, saw the two as they "quickly" walked away from Leahy Hall. 12/12/05 Tr. 191, 195. One wore "a black ski cap, like a black woolen winter hat" on his head. *Id.* at 196. He lost sight of them as they rounded the corner of Hartke Theater. *Id.* at 203.

officers jumped from the car and arrested the second man, *id.* at 138, subsequently identified as Ronald Reed, Vincent Reed's brother. 12/14/05 Tr. 43.

CUA Officer Julius Pittman also responded to the vicinity of Harewood Road and Taylor Street. 12/13/05 Tr. 56–58. There he saw a man fitting one suspect's description "walking real fast up the street with his hood over his head." *Id.* at 59. From a distance of "about twenty feet," Pittman said, "Campus police. Hold it right there." *Id.* at 62, 64. The man looked up and the hood fell from his head. *Id.* at 65. Pittman recognized the man as the appellant, a man named "Vincent," who formerly worked in housekeeping at CUA. *Id.* at 65–66. The man then looked toward Officer Dicks, who had been following him since observing him discard the ski mask near Hartke Theater. 12/12/05 Tr. 211–14. Dicks also recognized him, remembering that he was "a former employee of the university." *Id.* at 214. At about the same time, Officer Lee, who had driven north on Harewood Road, stopped near Reed and looked at him from "about 16 or 17 feet" away. 12/13/05 Tr. 141–42. He "immediately" recognized Reed as a CUA custodial employee whom he had greeted on several occasions. *Id.* at 142–43. Lee said, "Man, I know you. Why don't you put the gun down and turn yourself in." *Id.* at 143.

Reed then pulled a "short-nosed revolver" from his jacket and tried to stop passing cars. 12/12/05 Tr. 215–16, 218; 12/13/05 Tr. 66–71. After several unsuccessful attempts, Reed headed to the intersection of Harewood Road and Taylor Street. 12/13/05 Tr. 148; 12/12/05 Tr. 218–19. Officer Lee followed Reed in his vehicle. 12/12/05 Tr. 224; 12/13/05 Tr. 148–49. James Smith, a landscaper, was stopped in his pickup truck at the traffic light at the Harewood/Taylor intersection. 12/12/05 Tr. 219–20; 12/13/05 Tr. 94–97. Reed jumped into the bed of Smith's truck, pointed his gun at Smith and ordered Smith to

drive away.[3]  12/13/05 Tr. 100–01.  Instead, Smith fled the truck.  *Id.* at 103.  Reed jumped from the truck bed, got into the cab and began driving away.  12/12/05 Tr. 220.  Lee attempted to block his path; however, the truck Reed was driving rammed Lee's vehicle, jumped the curb and then sped away.  12/13/05 Tr. 77–79, 107–08.

Later that afternoon, an FBI agent discovered Smith's truck in the 800 block of Quincy Street, N.W.  12/13/05 Tr. 53–54.  FBI agents also searched the area between Leahy Hall and Hartke Theater and discovered a black skullcap with two holes cut in it, a knife and a bag of money orders.  12/12/05 Tr. 10, 13–14, 31–34.  Subsequent testing revealed that Reed's DNA was on the cap.  12/14/05 Tr. 142–50.

The next day, at approximately 3:15 p.m., officers of the Metropolitan Police Department (MPD) arrested Reed at a local motel.  12/7/05am Tr. 11; 12/13/05 Tr. 188–95.  Reed was in possession of approximately $1245 in cash.  12/14/05 Tr. 91, 165.  The officers took Reed to police headquarters and, at approximately 6:15 p.m., seated him in an interview room.  12/1/05 Tr. 39; 12/7/05am Tr. 11–12.  MPD Detective Gail Brown advised Reed that he was under arrest and read him his *Miranda* rights.  12/14/05 Tr. 68–71.  Reed agreed to speak with Detective Brown and FBI Special Agent Paul Timko.  *Id.*  Reed initially denied committing the robbery—explaining that he had been at CUA smoking crack.  12/14/05 Tr. 72–73.  Agent Timko and Detective Brown told Reed that several witnesses had seen him commit the carjacking.  12/7/05am Tr. 16.  Reed then confessed to both the credit union robbery and the carjacking.  12/14/05 Tr. 79–87.

---

[3]Smith described the carjacker as a "black man, about six feet tall, about 180 pounds, with short hair" and "a two-day growth of facial hair."  12/13/05 Tr. 108, 114.

The Government charged Reed with one count each of armed bank robbery (18 U.S.C. § 2113(a), (d)), armed carjacking (D.C. Code § 22-2803(a)(1), (b)(1)), destruction of property (D.C. Code § 22-303) and assault with a dangerous weapon (D.C. Code § 22-402). *See* Superseding Indictment 1. Reed moved to suppress his confession, *see* Mot. to Suppress 1, which motion was denied. 12/7/05pm Tr. 33. After a jury trial, Reed was convicted on the bank robbery, carjacking and destruction of property counts. *See* 12/15/05 Tr. 57–58. He was acquitted of assault with a dangerous weapon. *See id.* The district court sentenced Reed to concurrent prison terms of 300 months for armed bank robbery, 180 months for armed carjacking and 102 months for destruction of property. Judgment 2.

## II.

Reed first argues that his confession "was, under the totality of the circumstances, involuntary[] and should have been suppressed." Appellant's Br. 8 (capitalization altered). Second, Reed argues that the prosecutor made prejudicial statements during closing argument. *Id.* at 11. Finally, Reed argues that his sentence was unreasonable and he seeks a remand for resentencing before a different judge. *Id.* at 18.

### A. Confession

Reed claims that "in the several days [before] his arrest," he "ingested crack cocaine and alcohol . . . and was likely suffering some withdrawal symptoms at the time he purportedly" confessed. Appellant's Br. 8. He argues that "[h]e exhibited paranoia when he was arrested" and that the police "intentionally took advantage of [his] intellectually vulnerable [state]" by "plac[ing him] in a cold and uncomfortable room"; by "forc[ing him] to take off his clothes and . . . put on a jumpsuit without underwear"; and by "str[iking him] in the face at least once after he was placed under arrest." *Id.* at 8–9

(capitalization altered) (record citations omitted). He concludes that "this adroit psychological pressure[] . . . amount[ed] to coercive governmental action." *Id.* at 9.

In determining the voluntariness of a confession, we review the district court's underlying factual findings for clear error; however, "the ultimate issue of 'voluntariness' is a legal question" which we review *de novo*. *United States v. Baird*, 851 F.2d 376, 379–80 (D.C. Cir. 1988) (quoting *Miller v. Fenton*, 474 U.S. 104, 110 (1985)); *see also United States v. West*, 458 F.3d 1, 13 (D.C. Cir. 2006).[4] "A confession is inadmissible as a matter of due process if under the totality of the circumstances it was involuntarily obtained . . . ." *United Sates v. Bradshaw*, 935 F.2d 295, 299 (D.C. Cir. 1991). Although the defendant's mental condition can be a factor in the "'voluntariness' calculus," "this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry." *Colorado v. Connelly*, 479 U.S. 157, 164 (1996). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Id.* at 167. The Government must establish the voluntariness of a confession by a preponderance of the evidence. *Id.* at 168.

---

[4]The Government asserts that Reed never claimed before the district court that his confession was the product of withdrawal symptoms, "'intellectual[] vulnerab[ility]'" or coercive interrogation techniques and that, as a result, the claims have been waived. Gov't. Br. 25–26 (citing *United States v. Redman*, 331 F.3d 982, 986–88 (D.C. Cir. 2003)). We do not agree. The Government's arguments made during the suppression hearing manifest that the claims were before the district court. *See* 12/7/05pm Tr. 26–27 (discussing Reed's mental state and conditions of interrogation).

Given the totality of the circumstances, we do not believe Reed's confession was the product of police coercion. Reed alleges that the police acted inappropriately when they put him in a cold room without a blanket, struck him in the face at least once and put him in a jumpsuit without underwear. The record contains conflicting testimony with regard to the first two allegations. At the suppression hearing Agent Timko testified that Detective Brown gave Reed a blanket. 12/1/05 Tr. 47. Agent Timko also testified that Reed had not been hit. 12/7/05am Tr. 15. Assessing the conflicting testimony, the district court credited Timko over Reed. *See, e.g.*, 12/7/05pm Tr. 32–33 ("*even if* I were to accept [Reed's] testimony" (emphasis added)).[5] Nothing in the record persuades us that the district court's decision was incorrect. *See United States v. Broadie*, 452 F.3d 875, 880 (D.C. Cir. 2006) (district court credibility determination "'entitled to the greatest deference from this court on appeal.'" (quoting *United States v. Hart*, 324 F.3d 740, 747 (D.C. Cir. 2003))). Regarding Reed's third objection, we do not believe that his donning a jumpsuit without underwear, by itself, rises to the level of "coercive police activity" that renders a confession "not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Connelly*, 479 U.S. at 167. Accordingly, we conclude that Reed's confession was voluntary.

## B. *Prejudicial Statements*

Reed next objects to two allegedly prejudicial statements made by the prosecutor during closing argument. He first challenges the prosecutor's comparison of him to Jesse James and Billy the Kid. The prosecutor stated: "This is a classic, yet

---

[5]The fact that the district court discredited Reed's claim that he was struck is hardly surprising given his repeated claims that at the time he was experiencing "paranoid" delusions and thought people were trying to hurt or kill him. *See* 12/7/05am Tr. 45.

simple, bank heist. It is not Jessie [sic] James. It is not Billy the Kid. It is Vincent Reed and Ronald Reed, the Reed Brothers." 12/15/05 Tr. 12. Reed argues:

> At first blush, these outlaws may be thought of as romantic characters drawn from old West folklore—but they were real serial murderers. Jesse James was an ardent Confederate sympathizer, serial bank robber, serial murderer and infamous American outlaw. Billy the Kid, according to legend, killed 21 men, one for each year of his life. Reality was just as grim. In 1878, he killed two deputies and engaged in large scale cattle rustling—a major criminal scourge of the time. He was sentenced to death, escaped and was finally shot and killed by Sheriff Pat Garrett.

Appellant's Br. 11–12 (footnote omitted). Reed argues that courts "have consistently reversed convictions based on inflammatory remarks by the prosecution equating a defendant with notorious criminals." Appellant's Br. 13 (citing *Shurn v. Delo*, 177 F.3d 662, 665 (8th Cir. 1999) (reversing conviction after prosecutor alluded to Charles Manson, Richard Speck and Son of Sam)); *United States v. Steinkoetter*, 633 F.2d 719, 720 (6th Cir. 1980) (reversing conviction after prosecutor likened defendant to Pontius Pilate and Judas Iscariot); *Mathis v. United States*, 513 A.2d 1344, 1347 (D.C. 1986) (reversing conviction after prosecutor referred to defendant as "the Godfather")). Reed also objects to a statement made by the prosecutor vouching for Agent Timko's credibility. Appellant's Br. 15. She asked the jury: "Do you believe Agent Timko? Is defense counsel saying that agent Timko is making all this up and that none of this happened . . . ? Would agent Timko risk his entire career?" 12/15/05 Tr. 49.

Reed concedes that he did not object to these statements during closing argument and, therefore, they are reviewable only for plain error. *See United States v. Venable*, 269 F.3d 1086,

1089 (D.C. Cir. 2001). Under this standard, Reed must show (1) that the prosecutor's remarks constituted error, (2) that the error was "'plain'" and (3) and that the error "'affect[ed] substantial rights.'" *Id.* (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997)) (alterations added). "The third condition 'in most cases . . . means that the error must have been prejudicial: It must have affected the outcome of the district court proceedings.'" *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)) (alteration in *Venable*). "In evaluating the potential prejudice from an improper statement in closing argument, this court typically looks to the centrality of the issue affected, the severity of the prosecutor's misconduct, the steps taken to mitigate the misconduct, and *the closeness of the case*." *Id.* at 1091 (emphasis added). It is "'the defendant rather than the Government who bears the burden of persuasion with respect to prejudice.'" *Id.* at 1089 (quoting *Olano*, 507 U.S. at 734). Even if the defendant meets this burden, the reviewing "court may then exercise its discretion to notice a forfeited error, . . . only if . . . the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* (quoting *Johnson*, 520 U.S. at 467) (alteration in *Venable*).

Because the evidence against Reed was overwhelming, we do not believe that either of the challenged statements constitutes plain error.[6] From the moment the bank robbery began until the carjacking, the two men were in the continuous view of witnesses. Lombre, the bank teller, and Miller, the customer, watched the two flee from Leahy Hall. Once outside,

[6]The prosecutor's allusion to Jesse James and Billy the Kid, if error, constitutes harmless error at most. The statement regarding Timko's credibility *does* constitute improper "vouching." *See*, *e.g.*, *United States v. Boyd*, 54 F.3d 868, 871 (D.C. Cir. 1995) (prosecutor's statement that police witnesses would "jeopardize their careers and risk criminal prosecution" if they were untruthful constitutes improper vouching).

11

they were seen by Paolantonio, the CUA student, who watched them as they headed toward Harewood Road. *See supra* note 2. There they were spotted by CUA Officer Dicks who watched as Reed removed his black cap and discarded it. As the two proceeded up Harewood Road, Officer Lee and Officer Pittman apprehended one of them—Reed's brother, Ronald Reed. Lombre later confirmed that Ronald Reed was the unmasked robber. *See also supra* note 1 (Johnson's identification of Ronald Reed). The other man continued on Harewood where he was in plain view of CUA Officers Dicks, Lee and Pittman. Each recognized Reed as a former CUA employee. Moreover, Dicks and Pittman knew Reed by name. When Reed was arrested the next day, he had over $1200 in cash—an amount much less than what was taken from the credit union but nonetheless significant.

Nonetheless, Reed argues that this is a close case. He points to alleged inconsistencies in the evidence against him. He claims, first, that Lombre's testimony that one robber wore a "ski mask" is inconsistent with the fact that the "mask" recovered near Hartke Theater was in fact a "skullcap" with eye holes cut into it. Appellant's Br. 10. Next, Reed notes that the carjacking victim, Smith, was unable to identify him as the carjacker. *Id.* Finally, Reed notes that he was in possession of only approximately $1200 at the time of his arrest, leaving over $23,000 unaccounted for. *Id.* at 4.[7] Given the overwhelming

---

[7]Reed also argues that Pittman "first described the perpetrator who removed the mask as 'clean shaven,' although at the time of Reed's arrest one day later, he had a full moustache and goatee." Appellant's Br. 4–5 (record citations omitted). Even assuming that Pittman had so stated (which is not evident from the trial transcript—defense counsel asked Pittman if he had earlier described Reed as "clean shaven" and Pittman responded that he could not remember having done so, 12/13/05 Tr. 87–88), the record does not support Reed's claim that he had significant facial hair when he was arrested. In his brief, Reed

weight of the evidence against Reed, these alleged discrepancies are of no moment. Whether the robber wore a "ski mask" or "skullcap" with eye holes cut into it is insignificant as each has a similar appearance. Smith's inability to identify Reed is understandable given that the carjacker was located behind Smith in the bed of his truck when he was carjacked. *See* 12/13/05 Tr. 76–77, 101, 149. Finally, the fact that the police did not recover the entire $25,683 taken from the credit union when they arrested Reed the next day is hardly surprising in light of Reed's admission that he spent the next day on a "crack cocaine binge." Appellant's Br. 3.[8]

We note three additional factors supporting our conclusion that the prosecutor's comments were not plain error because they were not prejudicial. The prosecutor's vouching related to Agent Timko who testified only as to Reed's interrogation and confession. We have upheld the voluntariness of Reed's confession. Moreover, the prosecutor's reference to Jesse James and Billy the Kid *contrasted* them to the Reed brothers: their "simple[] bank heist" was "*not* Jessie (sic) James. It [was] *not*

---

cites "12/15/05 Trans. 9 (arrest photo admitted into evidence), 37 (description of Reed in arrest photo)" as evidence that he had a moustache and goatee at the time of his arrest. Appellant's Br. 4–5. However, the photo admitted into evidence at 12/15/05 Tr. 9—which depicts a man with a moustache and goatee—is the arrest photo of *Ronald* Reed. *See* Appellee's App. C. Furthermore, the description of the photo at 12/15/05 Tr. 37 occurred during defense counsel's closing argument. He described an unidentified photo that allegedly showed Reed "clearly with a mustache and clearly with a goatee." 12/15/05 Tr. 37.

[8]Reed also argues that the evidence against him is "largely circumstantial." Appellant's Br. 17. Even if this characterization were correct (which it is not), it would be immaterial because a conviction can be based *entirely* on circumstantial evidence. *United States v. Collins*, 56 F.3d 1416, 1421 (D.C. Cir. 1995).

Billy the Kid." 12/15/05 Tr. 12 (emphases added). The contrast merely highlighted the simplicity and lack of sophistication with which Reed and his brother committed the robbery.[9] Further, the court charged the jury that it "alone [is] to determine whether to believe any witness" and that "the [closing] arguments of the lawyers are not evidence," 12/15/05 Tr. 9, 13, which charge mitigated any harm caused by the statements. *See United States v. Brown*, 508 F.3d 1066, 1076 (D.C. Cir. 2007). Thus, neither the vouching for Agent Timko nor the allusion to Jesse James and Billy the Kid constitutes plain error.

*C. Sentencing*

Finally, Reed argues that although he received a sentence within the advisory range of the United States Sentencing Guidelines (Guidelines), his "sentence was unreasonable and he should receive a remand for resentencing before a different judge." Appellant's Br. 18 (capitalization altered). Reed claims that notwithstanding he presented a "compelling, if not overwhelming case for leniency," the district court "ignored all

---

[9]Citing *United States v. Richardson*, 161 F.3d 728 (D.C. Cir 1998), Reed argues that the prosecutor's comparison is no less prejudicial simply because of its negative wording. Appellant's Br. 13–14. In *Richardson*, we held that a black prosecutor's comment during closing arguments that "we *don't* all look alike," despite being phrased in the negative, was "instantly recognizable as a reference to racial stereotyping" and "could well have inflamed the emotions of the jury and resulted in a verdict based on something other than the evidence." *Id.* at 735–37 (emphasis added). Because "the evidence against appellant . . . was *not* such that his conviction was by any means a certainty"—the evidence "consist[ing] primarily of the testimony of" a single witness who claimed to have seen the defendant carrying a gun—we reversed the conviction. *Id.* at 732, 737 (emphasis added). Here, the evidence against Reed—which includes the testimony of multiple witnesses and DNA evidence linking him to the crime as well as his confession—leaves little doubt as to Reed's guilt.

mitigating evidence." Appellant's Br. 18–19. Reed explains that he "had been a superb high school basketball player," Appellant's Br. 18, and his lifelong dream was to become a professional athlete. Def. Sentencing Mem. 11. "Unfortunately, Reed never learned to read or write, and had many enablers assist him though two years of junior college." Appellant's Br. 18. When "'illiteracy shut down the one aspect of his life that had been positive to his self-image[—]his life as an athlete—'" Reed began abusing drugs. *Id.* at 19–20 (quoting Def. Sentencing Mem. 10). Reed contends that illiteracy and drug addiction had a "'crushing practical and psychological effect[]'" on him and prompted his criminal conduct. *See id.* (quoting Def. Sentencing Mem. 10). In light of these "tragic personal circumstances," Def. Sentencing Mem. 12, Reed argues that a 15-year sentence, rather than the 25-year sentence the court imposed, would have been appropriate. Appellant's Br. 20.

We review Reed's sentence under a "'reasonableness' standard." *See United States v. Bras*, 483 F.3d 103, 106 (D.C. Cir. 2007) (quoting *United States v. Booker*, 543 U.S. 220, 262 (2005)). "'[A] sentence within a properly calculated Guidelines range is entitled to a rebuttable presumption of reasonableness.'" *Id.* (quoting *United States v. Dorcely*, 454 F.3d 366, 376 (D.C. Cir.), *cert. denied*, 127 S. Ct. 691 (2006)); *see also Rita v. United States*, 127 S. Ct. 2456, 2462–63 (2007). However, "[a] sentencing court acts unreasonably if it commits legal error in the process of taking the Guidelines or other factors into account, or if it fails to consider them at all." *Id.*

We do not believe Reed's sentence was unreasonable. First, the record does not support Reed's view that the district court "ignored all mitigating evidence" or refused to consider his case for leniency. During the sentencing hearing, the court acknowledged Reed's mitigating evidence—expressing sympathy for the "frustration" Reed experienced when his dream of playing professional basketball ended. 3/21/06 Tr. 14.

The court acknowledged that drugs "destroy[ed]" Reed's life and contributed to many of his later difficulties. *See id.* Moreover, the court noted that it was "unfortunate" that Reed's family and teachers did not help him understand the importance of education or that "most people don't make it in sports." *Id.* at 13–14. The court also noted, however, that other factors weighed in favor of "severe punishment." *Id.* at 16. It explained that the robbery and carjacking traumatized their respective victims. *See id.* at 14–16. It also expressed frustration with Reed's "total lack of remorse" and his repeated complaints about the quality of his representation—which the court described as "outstanding." *Id.* at 11–12. Finally, the court explained that because Reed was almost forty at the time he committed his crimes, it had little hope that Reed might be rehabilitated. *Id.* at 15.

In imposing the 25-year sentence,[10] the court specifically considered the sentencing factors set forth in 18 U.S.C. § 3553. The court considered (1) the seriousness of Reed's crimes and their effect on the community, *see, e.g.*, 3/21/06 Tr. 14–15; (2) Reed's history and characteristics (e.g., noting his illiteracy, drug use, difficult childhood and lack of remorse); (3) the likelihood of recidivism, *id.* at 15; (4) Reed's need of mental health and drug treatment, which it ordered, *id.*; (5) Reed's need of a literacy program, which it also ordered, *id.* at 21–22; (6) the availability of consecutive sentences, which it rejected, *id.* at 21; and (7) the need for restitution to the victims, which it ordered, *id.* at 18–19. Furthermore, the court explained how the Guidelines affected its analysis:

 I did impose a sentence that is within the guidelines, and I imposed that sentence considering the factors in

---

[10]The district court originally imposed a 327-month sentence for armed bank robbery but later vacated it because it exceeded the statutory maximum. 4/10/06 Tr. 2–4.

the United States Code in assessing what the appropriate sentence should be in this case . . . .

I . . . also conclude that because of the serious nature of these offenses, that appropriate punishment is necessary, and I think that the sentence imposed is necessary to protect the community against having this type of offense committed again.

I imposed a guideline sentence and at the top of the guideline range . . . to reflect the fact that there were three separate events that needed to be punished. But for the fact that hopefully by the time he comes out, he will be too old to commit further crime, I would have given him a maximum sentence that would have been consecutive.

*Id.* at 20–21.

Finally, Reed claims that the district court mischaracterized his prior criminal record. Reed claims that before he committed these crimes, he "had virtually no history of violence, and that [the robbery] was freakishly atypical of [him];" however, according to Reed, the district court mistakenly believed he had "a long criminal history of violence." Appellant's Br. 19.[11] Reed highlights the court's observation during sentencing that at "nearly 40 years old, [Reed] was '*still* doing this type of

---

[11]Reed had two prior felony convictions. On April 14, 1990, Reed was arrested after selling crack cocaine to an undercover police officer. Def. Sentencing Mem. 2. He pleaded guilty to attempted distribution of a controlled substance and received one year of probation. *Id.* Later in 1990, Reed pleaded guilty to attempted possession of a controlled substance with intent to distribute. *Id.* at 3. Reed was sentenced to 30–90 months' imprisonment to be served concurrently with the 24–72 month sentence imposed when his probation was revoked. *Id.*

stuff.'" *Id.* at 19 (quoting 3/21/06 Tr. 15) (emphasis in Appellant's Br.). But at no point did the district court state that Reed had a "long criminal history of violence." Nor did the court's observation that Reed was "*still* doing this type of stuff," demonstrate that it misunderstood his criminal history. It merely reflected the court's concern that because Reed committed armed bank robbery when he was almost 40—an age at which criminal behavior is expected to have waned—recidivism was likely and therefore a significant prison sentence was necessary to protect the public.[12] This was a legitimate sentencing concern. *See* 18 U.S.C. § 3553(a)(2)(C) (sentencing factors include need "to protect the public from further crimes of the defendant").

For the foregoing reasons, the judgment of the district court is affirmed.

*So ordered.*

---

[12]The court explained that when people in their "teens" and "twenties" commit crimes:

> [Y]ou have a hope that, with age, they slow down and they quit committing this type of crime, but when somebody is mid-thirties—now almost 40—and they engage in this type of behavior, it causes you to have to believe that when you are that age and you are *still doing this type of stuff*, that there is not a lot of hope that this type of activity isn't going to occur again . . . .

3/21/06 Tr. 15 (emphasis added).