**Paul LINDSAY, Petitioner,**

v.

**NATIONAL TRANSPORTATION SAFETY BOARD; Federal Aviation Administration, Respondents.**

No. 94–1166.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 27, 1994.

Decided Feb. 24, 1995.

J. Scott Hamilton, Louisville, CO, argued the cause and filed the briefs for petitioner.

Kathleen Ann Yodice, Atty., F.A.A., Washington, DC, argued the cause for respondents. With her on the brief was Harry S. Gold, Atty., F.A.A. Susan S. Caron, Atty., F.A.A., Washington, DC, entered an appearance.

Before: SENTELLE, RANDOLPH, and TATEL, Circuit Judges.

Opinion for the court filed by Circuit Judge RANDOLPH.

Opinion concurring in part and concurring in the judgment filed by Circuit Judge TATEL.

RANDOLPH, Circuit Judge:

The most remarkable thing about this case is that petitioner thinks he is fit to hold a pilot's certificate. The Administrator of the Federal Aviation Administration revoked his certificate, a decision the National Transportation Safety Board sustained. To reconstruct the events precipitating this agency action, and to understand this petition for review of the Board's decision, we must go to central Florida and the pre-dawn hours of Sunday, October 17, 1993.

Two men and two women are at the Shamrock Lounge in Leesburg, drinking heavily. Their common interest is skydiving. Both men are also pilots. Neither woman is. One of the men, Phillip Smith, owns an aging Cessna Model 182, a single engine four-seater aircraft. He keeps his plane at the Leesburg Municipal Airport. Smith is with his girlfriend, Debra Hall, a bartender at the Shamrock. The other man, petitioner Paul Lindsay, holds an FAA airline transportation pilot certificate and has logged 4500 hours of flying time. Lindsay is with his girlfriend, Sandra Sprincis, a nurse who resides in a trailer in the nearby town of Umatilla. Lindsay lives with his mother some 10 miles away, but sometimes stays with Sprincis. They have driven to the bar together in Sprincis' car.

It is 1:30 a.m., and the Shamrock Lounge is about to close for the evening. "It's a nice night for a flight," the men observe. With that, their reckless, irresponsible plan is hatched. Lindsay wants to pilot Smith's plane. He has flown it before. Smith decides to fly it himself. That detail settled, the four men and women leave the bar and drive in Debra Hall's car to Leesburg Airport, 3 miles away. On the way, they stop to buy some beer.

Later, reports reach the Leesburg sheriff's office about a plane flying erratically over the town, a plane perhaps in trouble. Officers arriving at Leesburg Airport at 2:39 a.m. discover Hall's car and piles of clothing on the ground. No one is around. The runway

is dark. While the officers wait, a Cessna 182 lands. Philip Smith is in the pilot's seat and very drunk. Hall is next to him. In the back are Lindsay and Sprincis, both naked.

The officers ask Smith to step out. He complies, promptly fails a sobriety test and is arrested for violating Florida law. A deputy sheriff escorts Smith to his cruiser and drives him to the county jail. Other officers stay behind interviewing Hall, Lindsay and Sprincis. Hall gets out of the plane. Lindsay refuses to budge. He is loud, obnoxious and, like Smith, very drunk. He brags about his flying skills. He refuses to tell the officers his address. His girlfriend Sprincis gives them her address in Umatilla and gives the same address for Lindsay.

Sprincis tries to persuade Lindsay to leave with her and Debra Hall. He refuses. He tells Sprincis to "go ahead with" Hall. Lindsay promises to "beat her home anyway." The officers radio the lieutenant to report Lindsay's recalcitrance. By this time, it is 4:00 a.m. The lieutenant radios back that Smith has given Lindsay permission to stay in his plane. Sprincis decides to remain with him. Hall departs in her car, apparently sufficiently recovered from the effects of alcohol. At 4:12 a.m., the officers drive out of the airport, leaving Lindsay and Sprincis there alone. Two of the officers park close by, hidden in the darkness, watching the airport entrance and runway, concerned that Lindsay might try to take off in Smith's plane. The officers maintain their lookout until 4:41 a.m. All is quiet, and they leave to respond to another call.

About 5:00 a.m., a lieutenant and his deputy, having left Smith in jail, return to the Leesburg Airport. It is not yet light. The Cessna is gone. So are Lindsay and Sprincis. Remembering the address Sprincis had given them, they drive 12 miles to Umatilla. There on the runway of the Umatilla Airport they find Smith's plane. Sprincis' trailer is a few hundred yards away, across the street. The door is locked, and when the lieutenant knocks, no one answers. Later that day the police impound the plane.

These largely undisputed facts were adduced during a two-day hearing before an administrative law judge on Lindsay's chal-

lenge to the FAA Administrator's emergency order revoking his pilot's certificate. FAA regulations prohibited Lindsay from recklessly operating an aircraft, 14 C.F.R. § 91.13, and from acting as a crewmember of a civil aircraft "[w]ithin 8 hours after the consumption of any alcoholic beverage," 14 C.F.R. § 91.17(a)(1). Attorneys for both sides stipulated that the only issue at the hearing would be whether Lindsay piloted Smith's plane on its October 17 flight from Leesburg to Umatilla. The ALJ, for reasons we will describe, found that the FAA Administrator had not proven his case. The National Transportation Safety Board reinstated the revocation on appeal.

We have three issues. The first is whether the Board erred in reversing the ALJ's decision. The second is whether the Board's decision upholding the order of revocation is supported by substantial evidence. The third is whether, by presenting an affirmative defense, Lindsay waived any objection to the ALJ's refusal to rule in his favor at the close of the Administrator's case-in-chief.

The Board overturned the ALJ's decision because the ALJ had failed to apply the preponderance of evidence standard in assessing the Administrator's proof. In order to put the Board's reversal in perspective, we need to recount some of the additional evidence produced during the hearing.

The FAA's investigation revealed that when Debra Hall left Leesburg Airport shortly after 4:00 a.m. on October 17 she took Smith's keys with her. Unknown to Hall, however, Smith's plane could be operated without those keys. The pilot-side door did not lock and any sort of key inserted into the ignition switch would turn on the engine. An FAA investigator called Hall on October 18, the day after the flights, and asked her whether she knew who flew the plane to Umatilla. Hall said Lindsay flew it. Asked about the source of her knowledge, Hall stated—in language the investigator recorded in his notes—that because she could not figure out how the plane could have been flown to Umatilla without the keys, "I confronted [Lindsay] at the jail when I bailed Phillip out [about noon on October 17] and he told me

he flew it to Umatillo [sic]." At the hearing, Hall admitted having told the investigator that Lindsay piloted the plane to Umatilla. But she then denied having any knowledge to back up her assertion and said that when she had asked Lindsay at the jail, he told her he had not flown the plane. The investigator's contemporaneous notes show otherwise, of course, as does the investigator's testimony at the hearing. It is true, as Lindsay stresses, that at one point the transcript reports the investigator saying Hall told him Lindsay flew the plane to "Leesburg." But this appears to be either a slip of the tongue or a mistranscription. There is no other indication of any flight from Umatilla to Leesburg, and the ALJ understood the investigator to have been testifying about the flight from Leesburg to Umatilla.

When the Administrator rested, Lindsay moved for a judgment vacating the emergency revocation order on the ground that the FAA had failed to make out a prima facie case against him. The ALJ denied the motion, and Lindsay proceeded to put on his defense. There is no need to recite the defense in great detail. The ALJ found Lindsay's witnesses, including Lindsay himself, not credible. Lindsay testified that after the police left the airport, he and Sprincis got out of the plane, walked over to a phone booth and called Keith Jordan, a skydiver friend who lived in Leesburg. Jordan said he received the call about 4:00 a.m. With him in his apartment was Edward Carter, an aerial photographer who videotaped skydivers. Carter said he had travelled with Lindsay and Sprincis to Leesburg the evening before, and had been waiting for them to pick him up so that he could spend the night in Sprincis' trailer in Umatilla. After Lindsay's call awakened him, Jordan dressed, and he and Carter drove in Jordan's car to the Leesburg Airport, about 10 minutes away. When they arrived, Carter got out of the car, spoke with Lindsay, walked over to the plane with him, and together they unsuccessfully tried to secure the pilot-side door. Lindsay came back to the car and told Jordan and Sprincis that Carter was going to fly the plane to Umatilla. Jordan, Lindsay and Sprincis then drove out of the airport and back to Jordan's apartment, where they spent the night. Carter testified that he flew Smith's plane to Umatilla, about a 10-minute flight. He talked briefly with the security guard, Raymond Cruitt, and then walked over to Sprincis' trailer and fell asleep. He heard the officers knocking on the door of the trailer later in the morning, but decided not to answer.

The holes in this story are large, and the ALJ did not believe it. We will put aside the fact that if Jordan and Carter had arrived at the Leesburg Airport when they said, the officers maintaining surveillance would have seen them, but did not. The most glaring defect in Lindsay's defense is elsewhere—in the utter implausibility of Carter's having flown Smith's plane to Umatilla. Carter was a pilot, but he was not much of one. Since 1969 he had logged only 100 hours. When the FAA Administrator started inquiring about whether he still had a valid license to fly, Carter invoked his Fifth Amendment privilege against self-incrimination. Carter had never flown Smith's plane, and he did not have Smith's permission to fly it on October 17. He was unfamiliar with the Leesburg Airport. Yet according to him he decided to take off in the dead of night, without lights, on an unfamiliar runway that dropped off into a lake, in a plane he had never flown, without checking the oil level in the plane, and without even knowing how much, if any, fuel it had remaining. What was the urgency that caused Carter to decide to risk his life to get to Umatilla, a mere 15-minute drive away? When the FAA investigator asked him this rather obvious question before the hearing, Carter said he had no particular reason. At the hearing he changed his story. He explained that he had to get back to open up "Skyworld," a skydiving school at the Umatilla Airport, at 7:30 a.m., and when he met Lindsay and Sprincis at the Leesburg Airport he did not know where Sprincis had left her car. This is, to put it mildly, lame. Sprincis surely knew where she had left her car—at the Shamrock Lounge, only 3 miles from the Leesburg Airport. All Carter had to do was ask her. Besides, Jordan was supposedly there with his car. There is no reasonable explanation why, if he were telling the truth, Carter did

not even ask Jordan to give him a lift to Umatilla. Carter still had hours to go before he supposedly had to open up at Skyworld. And yet he says he borrowed—that is, stole—Smith's plane to make the 12–mile trip.

What of Raymond Cruitt, the self-described person responsible for keeping "things clean and neat and security" at the Umatilla Airport, the person to whom Carter allegedly spoke as he was walking from Smith's plane to the trailer? In rambling and disjointed testimony, Cruitt said that Carter had committed "perjury," that Carter had not flown Smith's plane because the actual pilot was one "Lawrence Eugene Kavel," a member of a group dealing in "hypnosis, mind control, disguises," a person Cruitt met some twenty years ago in Washington, D.C., but still recognized through the darkness despite his older appearance, a person Cruitt thought might be a government agent. Cruitt "yelled out to him, I said, well who are you screwing over tonight?" and "he says, you better go back and get in bed because the police are on their way." And so Cruitt went back to bed. Needless to say, the ALJ found Cruitt to be "unreliable" and attached no weight to his "bizarre" testimony.

As to the Administrator's witnesses, the ALJ viewed them as "entirely credible." The ALJ also found that Debra Hall had made the statements the FAA investigator attributed to her; her contrary testimony at the hearing was not "credible." As to Jordan and Sprincis, they had an obvious "bias," and there was "considerable doubt" about their version of the events at the Leesburg Airport. Carter was simply not "a credible witness."

Despite these findings, the ALJ thought Lindsay had introduced "an element of doubt" sufficient to preclude a finding that the Administrator had satisfied his burden of proof. Nonetheless, the ALJ said that he was unconvinced Lindsay "did not commit the alleged violations."

■ We sustain the Board's ruling that the ALJ misapplied the preponderance of evidence standard. The ALJ had two versions of the events before him. For the Administrator to prevail, the ALJ had to find only that it was, in the familiar formulation, "more likely true than not true" that Lindsay flew the plane to Umatilla. 3 EDWARD J. DEVITT ET AL., FEDERAL JURY PRACTICE AND INSTRUCTIONS § 72.04 (4th ed. 1987); *see Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust,* —— U.S. ——, ——, 113 S.Ct. 2264, 2279, 124 L.Ed.2d 539 (1993). This standard called for the ALJ to make a comparative judgment about the evidence, rather than a statement about what actually occurred. Certainty was not necessary, nor was the absence of any reasonable doubt. As the Board correctly put it, the ALJ's own findings reveal his belief that it was more probable than not that Lindsay made the flight.

■ As to the Board's ruling that Lindsay violated the regulations, there is substantial evidence to support it. Someone flew Smith's plane to Umatilla. All the credible evidence points to that someone being Lindsay. He had already demonstrated no hesitation about flying while intoxicated. At the bar he offered to fly the plane on its first outing of the night. Drunk or not, he was the only one among the cast of possible pilots who had the experience and ability to fly out of Leesburg in the dark and land safely in Umatilla. He had flown Smith's plane before. It is fair to assume that while he was sitting in the plane waiting for the police to leave, he knew that he could start the engine without Smith's keys. He was the one who defiantly remained in the plane. He is the one who bragged that without any means of transportation other than the plane, he would beat Sprincis back to Umatilla if she drove there with Hall. And he is the one Hall identified as having admitted to being the pilot on that flight. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" (*Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)), taking "into account whatever in the record fairly detracts from its weight" (*Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951)). That standard has been satisfied.

All that remains is Lindsay's claim that the Board erred in making the following ruling:

> At the close of the Administrator's case the respondent moved to dismiss, arguing that the Administrator had not established a prima facie case. The law judge disagreed and denied that motion. On appeal here the respondent challenges that determination. However, since respondent put on evidence in defense of the charges after the rejection of his motion to dismiss, we think he effectively waived his right to object to the law judge's ruling, for once the case is appealed to us, the issue becomes not the correctness of the law judge's view that the burden of going forward with evidence had shifted to the respondent, but, rather, the sufficiency of the evidence in the record, viewed as a whole.

The Board's decision strikes us as entirely correct. The rule it embodies has long governed appeals in the federal courts. A defendant waives an appeal of the denial of a directed verdict motion by putting on evidence. The Supreme Court so held in *Bogk v. Gassert,* 149 U.S. 17, 23, 13 S.Ct. 738, 739–40, 37 L.Ed. 631 (1893): "A defendant has an undoubted right to stand upon his motion for a nonsuit, and have his writ of error if it be refused; but he has no right to insist upon his exception, after having subsequently put in his testimony and made his case upon the merits, since the court and jury have the right to consider the whole case as made by the testimony." *See, e.g., Alston v. Bowins,* 733 F.2d 161, 163–64 (D.C.Cir.1984). We have not considered whether all of the Board's previous decisions are consistent with this approach. Even if some are not, the Board's failure to follow or to explain those decisions is harmless. 5 U.S.C. § 706. The Administrator's evidence in his case-in-chief surely was, for the reasons already given, enough to withstand Lindsay's motion.

*The petition for review is denied.*

Circuit Judge TATEL, concurring in part, and concurring in the judgment:

I agree with the majority that substantial evidence supports the decision of the Board. I write separately to express a concern that the Board's reasoning regarding the burden of proof and certain related credibility determinations borders on the arbitrary and capricious.

The ALJ concluded that neither party had "proven" its version of events; neither established that Lindsay had, or had not, flown the plane. The Board considered this a misreading of the preponderance of the evidence standard. "This is not a complicated case," the Board wrote; Lindsay "either made the flight the Administrator believes he made or he did not. The law judge's task was to decide that issue one way or the other." The ALJ, however, had no duty to determine whether Lindsay did or did not fly the plane. His only duty was to determine whether the party with the burden of proof had established that its allegations were "more likely than not." The ALJ did just that, concluding that the Administrator had not proven, by a preponderance of the evidence, that Lindsay flew the plane.

The Board's confusion—and its insistence that the ALJ decide the matter "one way or the other"—is understandable: As a factual matter, Lindsay either was or was not in the pilot's seat that night. In a legal sense, however, the ALJ's findings were entirely plausible because neither party had provided him with the quantum of certainty that he needed to conclude that its version of events had occurred.

Lindsay, of course, was not responsible for proving he did not fly the plane; indeed, it was technically possible for Lindsay to have won without presenting any defense at all. But he did present a case, and his evidence was useful to the ALJ because it "created doubts" in his mind about the strength of the Administrator's case. This language of doubt is not, as the Board seems to think, evidence of an inappropriately applied burden of proof. Instead, it is merely one way of articulating the necessary weighing of evidence that goes on in circumstantial cases like this one. *See Administrator v. Williams,* No. Order EA–3588, Docket SE–10463, 1992 WL 14200, 1992 N.T.S.B. LEXIS 125, at *3 n. 4 (May 26, 1992) (using language of "reasonable doubt" in a similar context); *Administrator v. Saunders,* No. Order EA–

3672, Docket SE–10104, 1992 WL 224887, 1992 N.T.S.B. LEXIS 189, at *14 (Aug. 29, 1992) (using language of "sufficient doubt" in a similar context). Lindsay's failure to prove that he did not fly the plane—and the doubt that his witnesses cast on the Administrator's case—was thus entirely consistent with the ALJ's finding that the Administrator failed to prove his case. As Chairman Vogt recognized in dissenting from the Board's opinion, the Board's conclusion that the ALJ improperly applied the burden of proof was incorrect.

The Board compounded its error by failing to understand how Lindsay's witnesses could have "cast doubt" on the Administrator's case when the ALJ did not entirely believe their testimony. According to the Board, the ALJ's conclusion that Lindsay was "less than credible" "ha[d] to be equated" to a belief that Lindsay flew the plane—i.e. that the ALJ really must have believed the opposite of Lindsay's testimony. The Board also concluded that the ALJ had "unwittingly" given credence to the testimony of other witnesses that he considered biased or not fully credible. Although the ALJ *may* ignore the testimony of witnesses that appear "less than credible," and although the ALJ *may* even choose to believe the opposite of the testimony of a witness who appears particularly deceitful, *see* 2 Davis & Pierce, Administrative Law Treatise § 11.2, at 188–90 (3rd ed. 1994); *cf. United States v. Zeigler,* 994 F.2d 845, 848–50 (D.C.Cir.1994), nothing requires, as the Board apparently concluded, that the factfinder *must* ignore the testimony of "less than credible" witnesses or must conclude the *opposite* of that testimony. Testimony by less than credible witnesses may be useful in several ways. For example, though the ALJ considers a portion of a witness' testimony to be deceptive, the rest of it may be credible. Such testimony might also cast doubt on the credibility or certainty of the Administrator's witnesses, or call into question the logical consistency of the Administrator's evidence or inferences that he seeks to draw from that evidence. As noted above, these considerations led the ALJ to conclude that the testimony of Lindsay's witnesses "cast doubt"—apparently significant doubt—on the Administrator's version of events.

*See* Joint Appendix at 624, 626, 628, 630 (giving credence to less than credible witnesses).

I can understand the Board's frustration with trying to review seesawing credibility determinations like those made in this case. In such instances, the Board would be entirely justified in reviewing the evidence *de novo,* as it did here, or in directing its ALJs to provide less equivocal credibility determinations. The Board went further, however, resting much of its decision upon an apparent misconception of the burden of proof and a sweeping misunderstanding that testimony by less than credible witnesses can have no role in an adjudication. Since the Board's own finding that Lindsay violated flight regulations is supported by substantial evidence, I can nevertheless concur in its reversal of the ALJ. Should its misconceptions regarding the burden of proof and the role of less than credible testimony affect the results of future Board opinions, however, I will come to view them with even more skepticism.