# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued April 11, 2011          Decided June 10, 2011

No. 10-5291

HUSSAIN SALEM MOHAMMED ALMERFEDI, DETAINEE AND
SALEM MOHAMMED SALEM ABDULLA ALMERFEDI, AS NEXT
FRIEND OF HUSSAIN SALEM MOHAMMED ALMERFEDI,
APPELLEES

v.

BARACK OBAMA, ET AL.,
APPELLANTS

Appeal from the United States District Court
for the District of Columbia
(No. 1:05-cv-01645)

*Robert M. Loeb*, Attorney, U.S. Department of Justice, argued the cause for appellants. With him on the briefs were *Tony West*, Assistant Attorney General, *Ian Heath Gershengorn*, Deputy Assistant Attorney General and *Douglas N. Letter* and *Matthew M. Collette*, Attorneys.

*S. William Livingston* argued the cause for appellees. With him on the brief were *Jason A. Levine* and *David H. Remes*. *Judith B. Chomsky*, *Brian E. Foster*, and *Alan A. Pemberton* entered appearances.

Before: ROGERS and KAVANAUGH, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court by *Senior Circuit Judge* SILBERMAN.

Opinion concurring in part and concurring in the judgment by *Circuit Judge* ROGERS.

SILBERMAN, *Senior Circuit Judge*: The United States appeals from the district court's decision granting Hussain Salem Mohammad Almerfedi's petition for a writ of habeas corpus. The district court concluded that the government failed to demonstrate by a preponderance of the evidence that Almerfedi was, as alleged, "part of" al Qaeda. The government contends that this conclusion was erroneous because the district court incorrectly found certain evidence unreliable, thereby improperly excluding it from consideration, and failed to give sufficient weight to the reliable evidence it did consider. We agree, and conclude as a matter of law that the government has demonstrated by a preponderance of the evidence that Almerfedi can be detained. We therefore reverse the district court's decision granting Almerfedi's petition.

I.

Almerfedi was captured in Tehran by Iranian authorities sometime after September 11, 2001. He was turned over to Afghani authorities in March 2002 as part of a prisoner exchange. Then, in May 2003, he was, in turn, transferred to Guantanamo Bay by United States forces. Little in the record indicates the circumstances of his apprehension in Iran, or his Afghan custody. The evidence the government presents to support its allegation that Almerfedi is "part of" al Qaeda comes from two sources: Almerfedi's own admissions and the statements of another Guantanamo detainee, Humoud al-Jadani.

A Yemeni national, Almerfedi submits that he left his home of Aden, in southern Yemen, sometime in 2001 in order to seek a better life in Europe. He set out with approximately $2,000, which he asserts he obtained by doing various menial jobs and by selling qat. Almerfedi said that he bribed a guard at the Pakistan Embassy to obtain a visa, and thereafter traveled to Lahore, Pakistan, where he stayed at the headquarters of Jama'at Tablighi, an Islamic missionary organization, which U.S. intelligence has designated a Terrorist Support Entity. That is a category of organizations that has "demonstrated intent and willingness to provide financial support to terrorist organizations," or to provide "witting operational support" to terrorist groups.

Almerfedi stayed at the Jama'at Tablighi center for two and one half months. He acknowledged that he stayed for free, paying only for food. He said that he kept to himself during this time because there were very few Arabic speakers like himself at the headquarters. He asserts that, in fact, he met only one other Arabic speaker while at the headquarters – Mohammad Ali. Ali, according to Almerfedi, offered to help Almerfedi travel to Europe by smuggling him into Iran, then to Turkey, and finally to Greece. Almerfedi accepted, paying Ali much of his life savings. They traveled from Lahore to the Iranian border, bribing border guards to cross into Iran before moving into Tehran. But then, instead of traveling towards Turkey, the two went in the opposite direction – 896 kilometers east – to Mashad, Iran, where they spent a month. They then returned to Tehran, where Almerfedi was captured by the Iranian authorities. When captured, Almerfedi admits that he still had at least $2,000 in cash, which the Iranians confiscated.

The government contends that Almerfedi, after he had returned to Tehran from Mashad, stayed at an al Qaeda-affiliated guesthouse. To support this allegation, the government relies on

statements Almerfedi made to al-Jadani while both were at Guantanamo Bay. Al-Jadani reported that Almerfedi told him that Almerfedi was housed in a guesthouse in Tehran maintained by al Qaeda in 2002 or 2003. And al-Jadani disclosed that other, unnamed detainees had said that a "Hussain al-Adeni" was an al Qaeda facilitator who resided at a guesthouse in Tehran. The government believes that Hussain al-Adeni was the same person as Almerfedi because the *nisha*[1] "al-Adeni" means "from Aden," which is where Almerfedi is from. According to the government, there was only one Hussain from Aden at Guantanamo Bay.

Although Almerfedi does not contest much of the government's narrative, he disputes that he ever stayed at an al Qaeda-affiliated guesthouse in Tehran. He points out that the dates al-Jadani reports Almerfedi having been at a guesthouse in Tehran are obviously incorrect – because it is undisputed that Almerfedi was captured by the Iranians in December 2001 or January 2002, Almerfedi could not have been at a guesthouse in 2002 or 2003.

Almerfedi, moreover, offers an innocent explanation for his travels. He says that he began his journey by proceeding through Pakistan for two reasons: he thought it would be easier for him to obtain a visa to Europe from Pakistan than from Yemen, and he wished to travel to Europe with Jama'at Tablighi in the hope that he could take advantage of the travel discounts it gives to its members, even though he admits that he was not a member of the organization and he repeatedly resisted attempts by Tablighi members to recruit him. He does not

---

[1] A *nisha* is a secondary Arabic name that describes the occupation, descent, tribe or residence of a person. The government alternatively refers to "al-Adeni" as a *kunya*, which can be used to represent the region an individual is from.

explain how they spoke to him since he contends he spoke only Arabic, or why they permitted him to remain at the headquarters despite his continued rebuffs.

The September 11 attacks, according to Almerfedi, interfered with his plans to travel to Europe with the Jama'at Tablighi, and so he paid Ali to smuggle him to Europe. He explains that he went to Mashad because he was in Ali's control and had little independent experience with foreign travel, and stayed there because Ali remained there. After his month in Mashad – during which time Almerfedi said that he sat all day in a house rented by Ali – Almerfedi claims that he began to worry that Ali had deceived him because the two took no further steps towards Europe. After raising this concern, Almerfedi contends that he and Ali returned to Tehran, where he was arrested.

Following his detention at Guantanamo Bay, Almerfedi petitioned for a writ of habeas corpus. The government alleged that Almerfedi was "part of" al Qaeda because he served as an al Qaeda facilitator, which is why he possessed an unexplained large amount of cash at the time of his capture.[2] The district court granted Almerfedi's petition. It refused to consider al-Jadani's statements, finding them unreliable. The district court, however, did recognize that Almerfedi's explanations for his travels were both "perplexing" and "not . . . convincing." Nevertheless, after reviewing all of the evidence, the court

---

[2] As we have explained, the government may detain any individual "engaged in hostilities . . . against the United States," who "purposefully and materially supported hostilities against the United States or its coalition partners," or who "is part of the Taliban, al Qaeda, or associated forces." *Al-Bihani*, 590 F.3d 866, 871-72 (D.C. Cir. 2010); *see also Hatim v. Gates*, 632 F.3d 720, 721 (D.C. Cir. 2011); *Awad v. Obama*, 608 F.3d 1, 9 n.1 (D.C Cir. 2010).

concluded that the government had not met its burden to show by a preponderance of the evidence that Almerfedi was "part of" al Qaeda.[3]

## II.

The government, on appeal, points out that the district court's decision was issued before we decided *Al-Adahi v. Obama*, 613 F.3d 1102 (D.C. Cir. 2010), holding that district courts must not consider each piece of government evidence by itself, but rather in connection with all the other evidence. It is argued that the district court erroneously rejected al-Jadani's statements as unreliable without considering them in light of the balance of the government's evidence. The government also contends that the district court committed error by giving insufficient weight to the rest of the evidence – particularly the incredible nature of Almerfedi's explanations. The government maintains that these errors are errors of law and seeks a remand to order the district court to reevaluate the evidence.

Almerfedi argues, rather persuasively, that at least as to the government's argument concerning al-Jadani's statement, it is really challenging the district court's fact finding – which we can only reverse under a clear error standard. As for the remaining evidence, Almerfedi contends that the district court properly weighed it to conclude that the government had not demonstrated by a preponderance of the evidence that Almerfedi was "part of" al Qaeda.

\* \* \*

---

[3] The district court noted that Almerfedi had been approved for transfer from Guantanamo Bay. But whether a detainee has been cleared for release is irrelevant to whether a petitioner may be detained lawfully. *See Awad*, 608 F.3d at 11.

At oral argument, able counsel for petitioner compared the government's evidence in this case against two standards: first, the evidence the government has produced in other cases, and second, the burden of proof necessary for a criminal conviction–which is, of course, beyond a reasonable doubt. With regard to the first comparison, the government's evidence may well have been stronger in previous cases than in this case. But that is irrelevant; all of those cases were not close. *See, e.g.*, *Esmail v. Obama*, — F.3d —, 2011 WL 1327701 (D.C. Cir. 2011); *Uthman v. Obama*, 637 F.3d 400 (D.C. Cir. 2011); *Al-Adahi*, 613 F.3d 1102; *Barhoumi v. Obama*, 609 F.3d 416 (D.C. Cir. 2010); *Awad*, 608 F.3d 1. We listed all the evidence supporting the government in those cases without needing to consider the minimum amount of evidence that would establish a preponderance.

Turning to counsel's criminal case comparison, we understand why counsel would seek to analogize a habeas case to a criminal case – in the latter situation, which is appealed after trial only by a defendant, we must ask ourselves whether the government's proof meets a strict hypothetical standard – beyond a reasonable doubt. But that is not the analytical framework called for by the preponderance of evidence standard used in civil cases, which applies to these detainee habeas corpus petitions.

The preponderance standard instead asks the court simply to "make a comparative judgment about the evidence" to determine whether a proposition is more likely true than not true based on the evidence in the record. *Lindsay v. NTSB*, 47 F.3d 1209, 1213 (D.C. Cir. 1995); *see also Concrete Pipe & Prods., Inc. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 622 (1993). It does not require a court to reach a conclusion about whether that proposition is actually true; "[c]ertainty [is] not necessary, nor [is] absence of any reasonable doubt." *Id.* In

other words, "[t]he preponderance of the evidence standard requires the party with the burden of proof to support its position [only] with the greater weight of the evidence." *Nutraceutical Corp. v. Von Eschenbach*, 459 F.3d 1033, 1040 (10th Cir. 2006); *accord United States v. Garcia-Guizar*, 160 F.3d 511, 523 n.9 (9th Cir. 1998). *See also United States v. Montague*, 40 F.3d 1251, 1253-54 (D.C. Cir. 1994) ("The preponderance of the evidence standard generally puts evidence on an evenly balanced scale."). That does not mean that we simply weigh, in a mechanical sense, the number of pieces of probative evidence on the government's side against that offered by a petitioner. *See In re Winship*, 397 U.S. 358, 371 n.3 (1970) (Harlan, J., concurring). Rather, the court makes a judgment about the persuasiveness of the evidence offered by each party and decides whether it is more likely than not that the petitioner meets the detention standard.[4]

\* \* \*

A district court's decision granting or denying a habeas petition is a mixed question of law and fact. The court's specific factual determinations are reviewed for clear error, whereas its ultimate determination – whether a detainee's conduct justifies detention – is a question of law reviewed *de novo*. *See Barhoumi v. Obama*, 609 F.3d 416, 423 (D.C. Cir. 2010). On review, we ask whether the evidence in the *whole* record – taking into account the premise that two unreliable pieces of information may corroborate each other, *Bensayah v. Obama*, 610 F.3d 718, 726 (D.C. Cir. 2010) – establishes that a

---

[4] Our cases have stated that the preponderance of the evidence standard is constitutionally sufficient and have left open whether a lower standard might be adequate to satisfy the Constitution's requirements for wartime detention. *See, e.g.*, *Uthman*, 637 F.3d at 404 n.3.

petitioner's detainability is more likely justified than not (under *de novo* review).[5]  As we noted, the court is never called upon to decide whether a petitioner definitively meets the detention standard – instead, it merely makes a comparative judgment about the evidence.

In *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), a plurality of the Supreme Court – to be sure considering due process limitations – suggested the appropriate framework for a court's determination of the ultimate legal question whether an individual could be detained: the government must put forth credible facts demonstrating that the petitioner meets the detention standard, which is then compared to a detainee's facts and explanation.  542 U.S. at 534 (plurality opinion).  The ultimate burden, under our cases, is on the government.[6]  We have said that this *Hamdi* approach "mirrors" the preponderance standard.  *Al-Bihani*, 590 F.3d at 878.  This approach meets "the goal of ensuring that the errant tourist, embedded journalist, or local aid worker has a chance to prove military error while giving due regard to the Executive once it has put forth meaningful support for its conclusion that the detainee is in fact an enemy combatant."  *Hamdi*, 542 U.S. at 534 (plurality

---

[5] That the preponderance burden governs resolution of an ultimate legal issue is not without analogy.  In determining the voluntariness of a criminal confession, the government must establish voluntariness by a preponderance of the evidence.  *United States v. Reed*, 522 F.3d 354, 359 (D.C. Cir. 2008).  But the ultimate issue of voluntariness is a legal question that is reviewed *de novo*.  *Id.*  There, as here, the court must ask whether, as a matter of law, there are sufficient facts on the record to demonstrate the ultimate legal issue by a preponderance of evidence.

[6] The *Hamdi* plurality, however, contemplated putting the burden of proof on the detainee once the government had put forth credible evidence.

opinion). The government's evidence, then, must meet at least a certain minimum threshold of persuasiveness.[7] But that is worlds apart from the beyond a reasonable doubt standard as the evidence need not convince the court of the doubtless merit of the detention.

\* \* \*

In this case, the government seeks to satisfy its burden by deploying Almerfedi's own admissions. First, Almerfedi acknowledges that he stayed for two and a half months at Jama'at Tablighi, an Islamic missionary organization that is a Terrorist Support Entity "closely aligned" with al Qaeda. *Almerfedi v. Obama*, 725 F. Supp. 2d 18, 29 (D.D.C. 2010). He asserts he refused to join the organization and remained largely incommunicado, but he stayed there for free. Although that evidence is probative, by itself it presumably would not be sufficient to carry the government's burden because there are surely some persons associated with Jama'at Tablighi who are not affiliated with al-Qaeda. But if we add Almerfedi's travel route, which is quite at odds with his professed desire to travel

---

[7] As an example, if the only evidence the government offered in a particular case was that a petitioner had been apprehended with an AK-47 in rural Afghanistan – which would be at least probative – it would not be sufficient to establish a basis for detention. Possession of a rifle is commonplace in Afghanistan, and therefore does not meaningfully distinguish an al Qaeda associate from an innocent civilian. But the government could satisfy its burden by showing that an individual was captured carrying an AK-47 on a route typically used by al Qaeda fighters. *Cf. Al-Odah v. United States*, 611 F.3d 8, 11, 16 (D.C. Cir. 2010) (significant that individual captured near Tora Bora in late 2001). And, of course, that a petitioner trained at an al Qaeda camp or stayed at an al Qaeda guesthouse "overwhelmingly" would carry the government's burden. *See Al-Bihani*, 590 F.3d at 873 n.2.

to Europe (and brought him closer to the Afghan border where al Qaeda was fighting), and also that he had at least $2,000 of unexplained cash on his person when captured, notwithstanding his claim to have given that much to Ali (which was all he brought from Yemen), the government's case that Almerfedi is an al Qaeda facilitator is on firmer ground.

We conclude that all three facts, when considered together, *see Awad*, 608 F.3d at 7, are adequate to carry the government's burden of deploying "credible evidence that the habeas petitioner meets the enemy-combatant criteria," *Hamdi*, 542 U.S. at 534 (plurality opinion).  We consistently have found such circumstantial evidence damning, *see Uthman*, 637 F.3d at 407 (collecting cases), and sufficient to distinguish a petitioner from the "errant tourist, embedded journalist, or local aid worker."  So too here.

Almerfedi therefore must "rebut [the government's] evidence with more persuasive evidence that he falls outside the criteria."  *Hamdi*, 542 U.S. at 534 (plurality opinion).  He has not.  He offers no evidence other than an explanation for his behavior.  The district court correctly, in our view, did not credit his account.  It labeled his reasons for residing with Jama'at Tablighi "not . . . convincing," concluding that Almerfedi had not explained why he stayed with Jama'at Tablighi, what he was doing during that period of time, and why he did not seek out other Arabic speakers aside from Mohammad Ali.  *See Almerfedi*, 725 F. Supp. 2d at 30.  And it regarded Almerfedi's explanations for traveling to Mashad as "perplexing."  *Id.* at 27.  The district court, however, erred by ignoring the implication of what it found to be dubious accounts because "false exculpatory statements" amount to evidence in favor of the government.  *Al-Adahi*, 613 F.3d at 1107; *cf. Aka v. Wash. Hosp. Center*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) ("The jury can conclude that an employer who fabricates a false explanation has something

to hide; that 'something' may well be discriminatory intent [– the ultimate legal issue]."). In sum, we regard the government's evidence, combined with Almerfedi's incredible explanations – as satisfying the government's burden without regard to consideration of al-Jadani's statements.

Nevertheless, we agree with the government's implicit argument that the district court clearly erred in regarding al-Jadani's statements as unreliable – merely "jail house gossip." Although this is a factual finding of the district court, it was not a credibility determination based on witness testimony. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 574-75 (1985). The district court rejected al-Jadani's statements about Almerfedi's direct admissions concerning Almerfedi's time in an al-Qaeda guesthouse because al-Jadani said that Almerfedi told him that Almerfedi was in that guesthouse in 2002 and 2003, whereas he had been captured earlier than those dates. However, one of the reports of al-Jadani's interrogations gives both an incorrect date and a correct date for Almerfedi's capture. The other report of his interrogation gives only the correct date. The government acknowledges the discrepancy in dates, but persuasively argues that al-Jadani's timing confusion is inconsequential. And it points out that al-Jadani's "reliability has been established" – with support in a classified declaration.[8]

The district court was also unpersuaded that al-Jadani's recounting of other detainee conversations confirmed Almerfedi's admission because al-Jadani did not identify those

---

[8] The government argued below that the evidence showed that al Qaeda maintained guesthouses in Tehran, which the district court noted but did not adopt as a finding. It, of course, buttresses al-Jadani's statements. Nor did the district court "find" that al Qaeda used hotels in Mashad as way stations for fighters despite the government's assertion. *See* Concurrence at 1.

other detainees. We think, however, it is quite understandable that al-Jadani would be reluctant to point them out to U.S. authorities. The district court also emphasized that they referred not to Almerfedi by last name, but rather only to "Hussain al-Adeni." Yet, as we noted, the phrase "al-Adeni", in Arabic, means "from Aden" – which, of course, is Almerfedi's home. Buttressing al-Jadani's credibility and that of the unnamed other detainees, al-Jadani reported to his interrogators the circumstances of "Hussain al-Adeni's" capture, which included arrest by the Iranians, transfer to the Afghans, and ultimate transfer to the Americans. These circumstances match Almerfedi's unique experiences and therefore make clear that Hussain Almerfedi and Hussain al-Adeni are the same man. (Indeed, the government maintains that there was only one Hussain from Aden at Guantanamo Bay.) That detailed description of Almerfedi's travels further indicates that al-Jadani's occasional mistakes in dates are inconsequential. Based on this evidence, we conclude that the district court clearly erred in finding unreliable al-Jadani's statements.

## III.

For the foregoing reasons we conclude as a matter of law that the district court erred in applying the preponderance standard and in finding unreliable the statements of al-Jadani. We therefore reverse and remand with instructions to the district court to deny Almerfedi's petition for a writ of habeas corpus.

*So Ordered.*

ROGERS, *Circuit Judge*, concurring in part and concurring in the judgment. I join the court in holding that the government met its burden of proof to show by a preponderance of the evidence that its detention of petitioner Hussain Almerfedi is lawful based on the evidence in the record regarding: (1) Almerfedi's two and one half month stay at the Jama'at Tablighi center in Lahore, Pakistan; (2) his eastward travel from Tehran to Mashad near the Afghan border in late 2001 or early 2002, which was 500 miles in the opposite direction of his purported destination of Greece via Turkey; (3) his possession upon his capture thereafter in Tehran of a large unexplained sum of money; and (4) undisputed evidence about the existence of Bin Laden-funded "guesthouses" in Tehran and the use of hotels in Mashad as waystations for fighters traveling to or fleeing from Afghanistan. *See generally* Maj. Op. at 10–11. Viewed together, this evidence supports a reasonable inference that Almerfedi was an al-Qaeda facilitator by the time of his capture in early 2002. Almerfedi presented no evidence that would suffice to "rebut [the government's] evidence with more persuasive evidence," *Hamdi v. Rumsfeld*, 542 U.S. 507, 534 (2004).[1] The district court found that Almerfedi's explanation of his travels was "not . . . a convincing explanation," *Almerfedi*

---

[1] In connection with being approved for release from Guantanamo, Almerfedi notes in his brief that the report on his voluntary polygraph examination in 2003 stated that "it appeared he had been truthful" when he denied ever associating with al Qaeda and when he explained his reasons for leaving home in Yemen. The reliability of such evidence is not beyond doubt, *see United States v. Scheffer*, 523 U.S. 303, 309–11 & nn. 6–8 (1998), but, in any event, the report noted that Almerfedi's description of his stay at the Jama'at Tablighi center for over two months months "appeared unrealistic." Report of Polygraph Examination May 2, 2003, JA 374. Further, the determination whether to release a detainee pursuant to the Executive Order of Jan. 22, 2009 involves a different question not at issue in a habeas corpus proceeding. *See Awad v. Obama*, 608 F.3d 1, 11 (D.C. Cir. 2010).

*v. Obama*, 725 F. Supp. 2d 18, 30 (D.D.C. 2010), and was "at the very least, perplexing," *id.* at 27. These findings are not clearly erroneous and their implications buttress the government's "credible evidence," *Hamdi*, 542 U.S. at 534, that Almerfedi's behavior and travel route fit the profile of an al-Qaeda facilitator. *See* Maj. Op. at 11 (referring to false exculpatory statements).

The court, consequently, need go no further to conclude that the district court erred, under a preponderance of the evidence standard, in granting the petition for a writ of habeas corpus. But it has, Maj. Op. at 12–13, and I write separately to explain why I am unable to join the majority's analysis of certain recorded statements by another Guantanamo detainee, Humoud al-Jadani.

Under a preponderance of the evidence standard, the district court must "determine whether a proposition is more likely true than not true based on evidence *in the record*," Maj. Op. at 7 (emphasis added). The majority rejects the district court's evaluation of al-Jadani's statements based on unnamed sources as "jailhouse gossip" and "inherently unreliable," *Almerfedi*, 725 F. Supp. 2d at 25. The district court found that the government cited no record evidence to verify that Almerfedi had been transferred to Guantanamo by the time of the first set of al-Jadani statements, *id.* at 24 n.4, or that al-Jadani was referring specifically to Almerfedi, *see id.* at 26.

The majority implies that this court owes a lesser standard of deference to the district court's factual findings regarding al-Jadani's statements because the district court did not make "a credibility determination based on [live] witness testimony." Maj. Op. at 12. Our review, however, of "a district court's factual findings [is] for clear error, regardless of whether the factual findings were based on live testimony or, as in this case,

documentary evidence." *Awad v. Obama*, 608 F.3d 1, 6–7 (D.C. Cir. 2010). The court explained in the identical procedural context that "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed." *Id.* at 7 (quoting *Boca Investerings Partnership v. United States*, 314 F.3d 625, 629–30 (D.C. Cir. 2003)). If the district court's factual finding is "plausible in light of the record viewed in its entirety," this court "may not reverse" because "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* (quoting *Overby*, 595 F.3d at 1294) (omission in original).

The record evidence does not lead to a "firm conviction" that the district court's analysis of al-Jadani's statements was mistaken, much less implausible. The first set of statements by al-Jadani purported to recount statements by four unnamed Guantanamo detainees that someone referred to as "Hussein ((Al-Adeni))" stayed in a Tehran "guesthouse" in late 2000 into early 2001. *Almerfedi*, 725 F. Supp. 2d at 24–25. The district court found these statements were "inherently unreliable"and "jailhouse gossip" because al-Jadani did not identify the four detainees or the sources for their information, *id.* at 25. This evaluation by the district court is "plausible in light of the record," *Awad*, 618 F.3d at 7, inasmuch as the dates these sources provided, as related by al-Jadani, are inconsistent with the date of Almerfedi's departure from Yemen in September 2001, *Almerfedi*, 725 F. Supp. 2d at 25. The majority hypothesizes that it is "quite understandable" that al-Jadani would be reluctant to identify the four detainees. Maj. Op. at 13. Even if true, the district court's finding was consistent with the proposition that a damning accusation from unidentified sources without any indication of the basis for their knowledge provides no basis to credit the accusation even if the person recounting

the accusation is otherwise credible. *Cf. Aguilar v. Texas*, 378 U.S. 108, 113–14 (1964). And, as the district court found, the government had not verified that Almerfedi was at Guantanamo by the time al-Jadani recounted this information. *Id.* at 24 n.4. The government states for the first time in its reply brief that at the time of al-Jadani's statements Almerfedi was "the only person named Hussein from Aden at Guantanamo," Reply Br. 4 (emphasis in original).[2] Assuming this argument is properly before the court, *but see Khadr v. United States*, 529 F.3d 1112, 1117 (D.C. Cir. 2008), a website cited in the reply brief as support does not, as asserted, assist the government, *id.* at 14 n.2.[3]

---

[2] The government also states in its reply brief that Almerfedi was the only person named "Hussein" at Guantanamo at the time. Reply Br. 4. Almerfedi's given name is "Hussain" not "Hussein." This may be a typographical error in the reply brief or both spellings may be alternative transliterations of the same Arabic name.

[3] The extra-record Department of Defense website (http://www.defense.gov/news/May2006/d20060515%20List.pdf) is a list of the detainees at Guantanamo from January 2002 through May 15, 2006, with the date and location of their birth, but not their residence prior to the time of capture. Assuming the court may take judicial notice of this document, in that its contents are "not subject to reasonable dispute" and "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," FED. R. EVID. 201, the document is of limited value. In its opening brief, the government explained that "al-Adeni" or "al-Adani" is a *kunya*, i.e., an honorific indicating the bearer is a father or mother (with a father's beginning with "Abu"), although some insurgents use a *kunya* representing the region they are from; by contrast, a *nisha* may describe the occupation, descent, tribe or residence of the person and begins with "al." Appellant's Br. 35 (citing a 2008 Defense Intelligence Agency ("DIA") report on "Names, Alias, Kunyas and Variants"). The majority rejects the government's view that "al-Adeni" is a *kunya*, concluding it is, if anything, a *nisha*. Maj. Op. at

5

By contrast, al-Jadani identified two sources for his information about al Qaeda guesthouses in Tehran and how those sources obtained their knowledge, specifically that the sources had themselves stayed in the guesthouses. The district court described this evidence, 725 F. Supp. 2d at 24, and in findings never rejected it, instead concluding, in effect, that assuming the existence of such guesthouses, the government had not shown by a preponderance of the evidence that Almerfedi was ever in Iran before the fall of 2001, *id*. at 25. Absent a finding to which this court could defer, our review is *de novo*. *See, e.g.*, *United States v. Microsoft Corp.*, 147 F.3d 935, 945 n.7 (D.C. Cir. 1998). As the government notes, "the district court did not question the reliability of al-Jadani's statements relaying information he received directly from al-Qaiti, who provided detailed — and consistent — information about the operation of al-Qaeda guesthouses in Tehran." Pet'r's Br. 44. Of course, the existence of the guesthouses and whether Almerfedi stayed in a such a house are two different questions; Almerfedi contests only the latter, leaving the former evidence unrebutted.

The second set of statements by al-Jadani purport to be a conversation with "Hussain al-Adeni." *Almerfedi*, 725 F. Supp. 2d at 26 & n.6. The district court did not credit these statements because there was an insufficient basis in the record to conclude

---

4. The website list of detainees indicates Almerfedi was the only Guantanamo detainee named Hussein who was born in Aden. The list, however, does not refer to the place of the detainee's residence, and a suggestion that a *nisha* is based on place of birth would contradict the government's evidence defining *nishas*. *But see* Maj. Op. at 4 n.1. Thus the list does not confirm that Almerfedi was the only detainee named Hussain (or Hussein) to have resided in Aden; at least two other detainees named Hussain (or Hussein) were born in Yemen.

that al-Jadani was referring to Almerfedi and other government evidence did not corroborate al-Jadani's account, *id.* at 26–27; Maj. Op. at 13. The district court's conclusion that the statements "cannot be credited" and are "unreliable," *Almerfedi*, 725 F. Supp. 2d at 27, is at least "plausible in light of the record," *Awad*, 608 F.3d at 7. To the extent the majority suggests that the circumstances of al-Adeni's capture seem to match those of Almerfedi (who was arrested by Iran, transferred to Afghan custody, and then transferred to U.S. custody) and posits this path was "unique," Maj. Op. at 13, the government neither makes such a claim nor points to record evidence that would undermine the district court's conclusion that the coincidence of paths "add[s] little" to the government's case that Almerfedi stayed in Tehran guesthouses, *Almerfedi*, 725 F. Supp. 2d at 27, much less to show that this evaluation was not plausible.